UNITED STATES, Appellee

v.

JOHN H. MARKER (GS–11), Department of the Army
Civilian, Appellant.

1 USCMA 393, 3 CMR 127

No. 281

Decided May 19, 1952

LT. COL. George M. Thorpe, U. S. Army, and 1ST LT. Michael E. McGarvey, U. S. Army, for Appellant.
LT. COL. Paul J. Leahy, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

Petitioner, a civilian employee of the Department of the Army, was convicted by general court-martial in Japan under three specifications alleging violations of Article of War 96, 10 USC § 1568. He was sentenced on May 25, 1951, to be confined at hard labor for 3 years. Army reviewing authorities have upheld the findings and sentence. We granted review for the purpose of considering substantial issues of law raised by petitioner.

John H. Marker, the accused, had been employed for a considerable period prior to the commission of the present offenses by Base Industrial Group 5 and the Tokyo Ordnance Depot as production superintendent of the Akabane Tire Plant. Operations at the

Plant were conducted for the Army under contract with the Industrial Group and the Depot by the Bridgestone (Nippon) Tire Company, a Japanese corporation, under the supervision of occupation personnel, both military and civilian. The nature of petitioner's responsible official position was such that he had general authority to hire and fire, or cause the Company to hire and fire, all personnel, and the Bridgestone people were obliged to accept and execute all orders and directives issued by him regarding production matters. Although the Akabane Plant is located in the Western environs of metropolitan Tokyo, at the beginning of his connection petitioner was billeted in Yokohama. However, the necessity for overtime and irregular hours made commutation between his Yokohama billet and the Plant inconvenient, and sometime thereafter he was authorized to surrender his original quarters and to settle in the Yaesu Hotel, an Army billet in downtown Tokyo. After the outbreak of the Korean action there was a considerable increase of business in the rebuild section and in other divisions of the factory concerned with the manufacture for the Army of critical synthetic rubber items for combat vehicles and weapons. As a result of this, more overtime was necessary, and petitioner was frequently obliged to remain overnight in his Plant office. Thereupon, he claims, he gained permission from the group manager of Base Industrial Group 5, the ordnance rebuild facility, to have set aside for his use a room in an employees' club operated at the Akabane installation by the Bridgestone Company for the benefit of its officials and employees. Thereafter petitioner lived as a normal thing in this bedroom in the clubhouse. According to the principal officials of the Company, however, at about this time he expressed his desire to them that the Bridgestone organization erect for him a residence within or near the factory compound—and indicated in detail the type and size of house he wished. However, since his specifications involved a rather costly enterprise, the Company opposed it. Petitioner, nevertheless, continued daily to urge Company officials to decide the question in a manner favorable to him. The Company was at the time building several residences of more modest design for its own staff members on nearby land owned by it or obtained for the purpose. Under all of the circumstances Bridgestone officials determined finally and reluctantly to acquiesce in the demands of the accused, and between April and August 1950 they built the house requested by him. It was the intention of the Company that the accused should pay a rental charge for his occupancy of this property, and it proposed—following the termination of Allied Occupation—to assign the residence as quarters for some Company officer of high position. Upon completion, petitioner removed his Japanese wife and his daughter into the house, which they continued to occupy thereafter as their home. Marker, himself, however, retained his bedroom at the club and visited his family only irregularly, principally during week ends. The cost of the structure in question, as shown by testimony and by receipted contractor's bills, aggregated 3,200,000 yen, which was paid by the Company. After establishing his family in the home, petitioner frequently urged that title to the property be vested in his daughter, Mary Jane, offering to pay $1,000 (360,000 yen) therefor. This financial arrangement was not acceptable to the Bridgestone Company and its officials refused this demand. Although payment of rent had been expected by the Company, and although petitioner's wife and daughter occupied the property from August 1950 to March 1951, no such payment was ever made. Petitioner informed agents of the owners that he was attempting to secure SCAP approval of the house as his billet on a private rental basis. Nothing came of this.

Early in the month of December 1949, Marker stated to a Bridgestone Tire Company official that he would like to secure several Hapi coats. A Hapi coat may be described as a decorative garment modeled on the lines of a workman's jacket, but made of silk, worn by Japanese on ceremonial occasions, and much sought after by occidental women

**395**

for use as lounging coats or evening wraps. The Bridgestone man to whom he spoke agreed to arrange for a vendor thereof to bring a collection of such clothing to the factory in order that petitioner might make his choice from those known to be of good quality. A seller was located who submitted some dozen coats for inspection. Marker selected eight of these having a value, as shown by their price tags, of 17,000 yen. The Company paid the bill for these coats and that for accompanying paper boxes, in all 17,475 yen. Petitioner accepted the garments together with the personal cards of several officers of the reluctant donor corporation, which cards were to accompany the items when they were sent by Marker as Christmas gifts to his mother, sisters, and nieces in the United States. The testimony showed that the Company representatives concerned had fully expected reimbursement for the cost of the coats when arrangements were made for the showing. However, payment was not in fact made, and when it became evident that no such action on petitioner's part was contemplated, they determined to make a virtue of necessity and to attach personal cards such as would be used had a gift been intended originally.

Because of a nervous disorder, petitioner's physical condition during much, if not all, of the period of his Bridgestone connection was not satisfactory. To obtain rest and relaxation he left the factory during the month of August 1949 for a two-week stay, and spent most of this vacation period at a hotel, the Green Gate Villa, located in Hakone National Park. Petitioner was accompanied to the mountain resort by his Japanese wife and their daughter, as well as by a member of the Company's staff, all of whom remained throughout his stay there. During this holiday several other officials of the tire corporation visited the lodge ostensibly to consult with Marker on business matters, to report to him on conditions of production at the plant, and to gain the benefit of his opinion on the conduct of current and future operations. Throughout his vacation visit many informal social events were held, food

and drink being provided by the hotel, and the total bill submitted for Marker's party amounted to 68,380 yen and covered a nine-day stay. The Villa's bill was paid by the Company in the regular course of business as though it were a normal business expenditure. In addition, Company personnel, who visited with the accused for varying periods during his stay in the mountains, brought along out of Company funds and spent on entertainment in his behalf differing amounts of money, including on one occasion as much as 50,000 yen. In no instance was the corporation reimbursed by petitioner for any part of these expenditures.

As a result of the occurrences described above, petitioner was found guilty under specifications phrased in the following language:

"Specification 1: In that John H. Marker, Department of the Army Civilian, a person serving with the Armies of the United States without the territorial jurisdiction of the United States, while serving as supervisor of the Akabane Tire Plant, Tokyo Ordnance Depot, APO 712, did, at Akabane Tire Plant, Tokyo Ordnance Depot, APO 712, during the month of December 1949, wrongfully and unlawfully accept a gift from the officials of the Bridgestone Tire Company, Limited, formerly Nippon Tire Company, Limited, a partnership operating the Akabane Tire Plant under contract for the United States Government, to wit: Eight (8) short ladies' coats, commonly known as 'Hopi coats', of a value of approximately Seventeen Thousand (¥17,-000) Yen.

"Specification 2: In that John H. Marker, Department of the Army Civilian, a person serving with the Armies of the United States without the territorial jurisdiction of the United States, while serving as supervisor of the Akabane Tire Plant, Tokyo Ordnance Depot, APO 712, did, at Tokyo Ordnance Depot, APO 712, wrongfully and unlawfully abuse his official position by causing the Bridgestone Tire Company, Limited, formerly Nippon Tire Company, Limited, a

partnership operating the Akabane Tire Plant under contract for the United States Government, at a cost of Three Million, Two Hundred Thousand (¥3,200,000) Yen, to construct a house, to wit: #86 1-chome, Harajuku, Shibuya-ku, Tokyo, Honshu, Japan, which he, the said John H. Marker, unlawfully occupied as his own living quarters from about August 1950 to about March 1951.

"Specification 3: In that John H. Marker, Department of the Army Civilian, a person serving with the Armies of the United States without the territorial jurisdiction of the United States, while serving as supervisor of the Akabane Tire Plant, Tokyo Ordnance Depot, APO 712, did, during the month of August 1949, wrongfully and unlawfully abuse his official position by permitting the Bridgestone Tire Company, Limited, formerly Nippon Tire Company, Limited, a partnership operating the Akabane Tire Plant under contract for the United States Government, to pay approximately One Hundred Twenty Thousand (¥120,000) Yen, for his, the said John H. Marker's accommodations and personal expenses for two weeks at the Green Villa Lodge in the vicinity of Lake Hakone, Honshu, Japan."

We are met at the threshold with the question of jurisdiction of the general court-martial, which tried ▮▮▮▮▮▮ ▮ him, over the person of the accused for a violation of the Articles of War. It is urged by the Government that jurisdiction attached under Article of War 2(d), 10 USC § 1473. It is to be noted that the accused was a civilian both at the time of the alleged offenses and the time of trial. We are mindful of ▮▮▮▮▮▮ ▮ the policy, often voiced by Federal courts, that civilians are not presumed to be subject to military law. It is, therefore, incumbent on the claimant for military jurisdiction over such persons to establish that authority therefor has been conferred clearly by Federal statute. McCune v. Kilpatrick, 53 F Supp 80, 83; In re DiBartolo, 50 F Supp 929, 930.

Under power granted by Article I, Section 8, of the Constitution, Congress enacted the Articles of War for the government of the Army. Ex parte Reed, 100 US 13, 25 L ed 538. In these Articles Congress has delimited those persons who are subject to military law, and has included therein certain classes of civilians. Article of War 2(d) provides as follows:

"All retainers to the camp and all persons accompanying or serving with the armies of the United States without the territorial jurisdiction of the United States, and in time of war all such retainers and persons accompanying or serving with the armies of the United States in the field, both within and without the territorial jurisdiction of the United States, though not otherwise subject to these articles."

The power of Congress to make amenable to military jurisdiction the classes of civilian personnel mentioned in the quoted Article is so well settled as to be beyond dispute. Ex parte Gerlach, 247 Fed 616; Grewe v. France, 75 F Supp 433; Ex parte Jochen, 257 Fed 200. See also Duncan v. Kahanamoku, 327 US 304, 90 L ed 688, 66 S Ct 606. Our inquiry must, therefore, be whether the accused is, within the meaning of Article 2(d), a "retainer to the camp," or a person "accompanying or serving with the armies of the United States." Clearly he was not a "retainer to the camp." This subdivision includes such persons as "officers' servants, newspaper correspondents and telegraph operators." Senate Report No. 130, 64th Congress, First Session. It has, indeed, more historical than current significance. Nearer the mark is the question of whether the accused, Marker, was "accompanying or serving with" the Army. This has been the subject of much litigation in Federal courts, and we are without disposition to attempt a definitive test for inclusion within the class. It is enough, we believe, to decide the case before us. No doubt is entertained that the petitioner does fall within this category. As already noted, he was employed by the Army in an activity specifically related to existing

hostilities. The products of the plant in which petitioner served as superintendent were used by the Armed Forces in both Japan and Korea, and petitioner worked under the direct supervision of officers of the United States Army. Federal cases make it clear that under the circumstances of this case, petitioner was "accompanying or serving with the armies of the United States." Perlstein v. United States, 151 F2d 167, (CA3rd Cir), cert dismd, 328 US 822, 90 L ed 1602, 66 S Ct 1358; Grewe v. France, supra; Ex parte Jochen, supra; U. S. ex rel Mobley v. Handy, 176 F2d 491, (CA5th Cir), cert. den, 338 US 904, 94 L ed 556, 70 S Ct 306; Hines v. Mickell, 259 F 28, (CA4th Cir). Since we hold that jurisdiction exists under Article of War 2(d), it is unnecessary to consider the possible alternative jurisdiction under Article of War 12, 10 USC § 1483, which operates to cover American nationals abroad who are amenable to the laws of war. See Yabusaki v. United States, 67 BR 265. Since petitioner is subject to military law under Article of War 2, supra, he is, by virtue of the language of this Article and that of Article 12, subject likewise to trial by general court-martial for violations of that law as expressed inter alia in the Articles of War.

The next issue raised is whether the specifications as a matter of law may be said to state offenses for which this accused is amenable to prosecution. Involved here is the question of whether the misconduct alleged was "of a nature to bring discredit upon the military service," and whether, if it was, petitioner may be punished therefor. We assume, in petitioner's behalf, that the gifts and favors, alleged in the present specifications to have been conferred, were predicated on no specific past or future consideration or favor on his part, and that he did not feel obligated to return them by acting on behalf of the Japanese donors in a manner detrimental to his responsibility to the United States Government. No showing is made on either of these subjects. However, it is naive in the extreme to believe that such gifts or favors may be accepted by one in petitioner's position

**398**

of power without kindling at least a spark of hope in the heart of the giver. It requires no citation of authority to establish that with entire propriety the public regards the acceptance of gratuities by its servants with grave suspicion. Any slightest suggestion that officials of the United States representing their Government abroad may be amenable to the persuasion implicit in action of this character cannot but be seriously detrimental to the interests of the Government—and more specifically to those of the particular branch or division involved. That such conduct may be condoned or even approved as it is found in a purely private setting is not material here. We are concerned with the operations of public business by officials or agents of the Federal Government. We note that the acceptance of gifts by Army officers from persons with whom they are engaged in the transaction of business has on repeated occasions been held to be a violation of Article of War 96, 10 USC § 1568. United States v. Goodman, 21 BR 243; United States v. Cayouette, 21 BR 97; United States v. MacDowell, 32 BR (ETO) 1. That such activities when conducted by officer personnel must inevitably bring discredit on the military service is clear. In view of the nature and peculiar circumstances of his employment, we perceive no reason why petitioner should not be held to a similar high standard of conduct. Although not in uniform, it must have been familiar knowledge in the area concerned—and was certainly well known to the people with whom he was dealing—that petitioner was serving with the Army, and that in his official capacity he represented that service and the Department of the Army. Any improper acts of his—and particularly those related to his official duties—would therefore reflect directly on the military service.

That petitioner's misconduct was violative of military standards is further borne out by the fact that it was condemned by existing regulations. Department of the Army Memorandum No. 600–10–4, July 1, 1948, specifically provides that agents of the Government must not accept gratuities intended to

influence the strict impartiality that must prevail in all business contacts. This memorandum is expressly made applicable to both military and civilian personnel functioning under the aegis of the Department of the Army. See also Army Regulations No. 600–10, November 10, 1950, and Army Regulations No. 600–205, December 3, 1951, paragraph 3b, in which the following language is used:

"The broad policy of the Department of the Army with regard to conflicting private interests of military and civilian personnel assigned to procurement and related duties is set forth as follows: Every member of the service, military or civilian, is bound to refrain from all business and professional activities and interests not directly connected with his duties which would tend to interfere with or hamper in any degree his full and proper discharge of such duties. If such person finds that his duties require him to act as an agent of the United States in a manner from which he may derive financial profit or other benefits, he will report the facts immediately to higher authority and he will be relieved from such duties immediately. Agents of the Government will not accept gratuities from concerns or individuals with whom they have government business contacts. Furthermore, they will not accept, directly or indirectly, gratuities, gifts, or courtesies which influence, or *might reasonably tend to influence,* the strict impartiality which must prevail in all government business relations."

To similar effect are Supreme Commander Allied Powers Circular No. 23, September 13, 1949, and Supreme Commander Allied Powers Circular No. 20, November 29, 1950, paragraph 16, containing the following provision:

"*General conduct.* There are many limitations upon the activities of occupying forces in occupied countries which are necessary in order to further the objectives of such occupation. The general principle underlying such limitations is that individuals of occupation forces are bound to refrain from actions not directly connected with their occupation duties which would tend to interfere with or influence in any degree the full and proper discharge of their duties or would normally give rise to a reasonable suspicion that such activities would have that effect. Any substantial departure from the underlying principle constitutes conduct which is inimical to the objectives of the occupation, and is punishable as such. It is impracticable to enumerate all activities to which such limitations apply. The following examples, however, may be regarded as typical subjects of prohibitions:

"a. Acceptance of any member of the occupation forces from Japanese nationals or nonoccupation personnel, as defined in Circular 11, General Headquarters, Supreme Commander for the Allied Powers, 1950, of contributions, gifts, or emoluments, other than those of small value."

It is recognized, of course, that petitioner was not charged specifically with a violation of any one or more of the mentioned directives. It is also recognized that some of them were not in effect at the time all instances of the present misconduct took place. Reference is made to them, however, since they are reflective of well-known and customary principles operative in the service and theatre concerned, and may be regarded as codifications of military custom legitimately to be considered in the administration of Article of War 96, supra. Cf. Dynes v. Hoover, 61 US 65, 15 L ed 838. We hold, therefore, that the acts alleged in the present specifications constituted offenses under Article of War 96, supra, and that the accused, Marker, properly was subject to trial for such misconduct.

It is further urged by appellate defense counsel that the instant specifications, even though stating offenses basically, are defective in several respects. The following defects are claimed: (1) That there is duplicity in Specification 2 in that its language alleges two separate acts, i.e., that petitioner caused the house to be erected, and that he

**399**

occupied it. (2) That there was a failure to state specifically the date of the misconduct alleged in Specification 2. (3) That there was a failure to include in each specification an allegation that the stated misconduct was of a nature to bring discredit on the military service.

Fortunately we are no longer bound by the ancient rigor of pleading at common law. It is the ■ modern rule that formal defects in indictments, not prejudicial, will be disregarded. "The true test of the sufficiency of an indictment is not whether it could have been more definite and certain, but whether it contains the elements of the offenses intended to be charged." Hagner v. United States, 285 US 427, 431, 76 L ed 861, 865, 52 S Ct 417. If the indictment informs the accused of what he must be prepared to meet, and is sufficiently definite to eliminate the danger of future jeopardy, it will be held sufficient. Martin et al v. United States, 299 Fed 287 (CA4th Cir); Roberts v. United States, 137 F2d 412 (CA4th Cir); Nye v. United States, 137 F2d 73 (CA4th Cir).

Testing the specifications before us by the standards set out above, we find them to be sufficient. We find no problem of duplicity in Specification 2. The acts there set out constitute succeeding steps in a continuing transaction. The stated facts fully apprised petitioner of the nature of that transaction. Broken into separate specifications, each alleging a completely separate act, a problem of objectionable multiplicity might even have been encountered—although we express no final opinion on this subject. As to the date of the offense alleged in Specification 2, this portion of the charge states that the house was occupied from about August, 1950 to March, 1951. Of necessity, the construction preceded the occupancy, and petitioner could have been in no way confused as to the acts alleged.

Finally, we find no reason ■ for the inclusion in the specifications of the words "conduct of a nature to bring discredit upon the military service." In truth, we believe the suggested language to be nothing more than traditionally permissible surplusage in specifications laid under Article of War 96, supra. Its use therein can add nothing of legal effect to an allegation of conduct not of such a discrediting nature—and its omission detracts not at all from conduct which clearly is. We find that each specification sufficiently informed petitioner of the allegations he must be prepared to meet, and, together with the evidence adduced, foreclosed any possibility of double jeopardy.

We have examined the record carefully and find substantial evidence to support the findings. Other and less serious contentions raised by appellate defense counsel have been considered in light of the evidence of record. They are found to be without merit, and further discussion of them is unnecessary. The decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.