UNITED STATES, Appellee

v.

ROBERT W. GROW, Major General, U. S. Army, Appellant

3 USCMA 77, 11 CMR 77

No. 2050

Decided July 17, 1953

Col Roger M. Currier, U. S. Army, for Appellant.
Lt Col Paul J. Leahy, U. S. Army, for Appellee.

ROBERT E. QUINN, Chief Judge:

Major General Robert W. Grow, the accused, was convicted by general court-martial of an infraction of security regulations, two offenses of dereliction of duty, each in violation of Article 92, Uniform Code of Military Justice, 50 USC § 686, and an additional security infraction, laid under Article of War 96, 10 USC § 1568. He was sentenced to be reprimanded and suspended from command for six months. The convening authority approved and the board of review affirmed the findings and sentence. The case is before this Court under the provisions of Article 67(b)(1) of the Code, 50 USC § 654, requiring mandatory review of all cases in which the sentence affects a general officer.

Attesting the skill of counsel and the ability of the law officer throughout the trial is the scarcity of errors assigned by the accused and relied upon by his counsel before us. The directness with which the evidence was presented and the cross-examination conducted, as well as the vigor and economy of argument were outstanding examples of legal skill. Counsel for the Government and the accused who participated in the trial have also appeared before us, and each has presented able arguments on the three assignments of error relied upon by the accused.

A brief recital of the factual background of the charges will clarify these assignments. After receiving preparatory instructions, Major General Grow was assigned to Moscow, Union of Soviet Socialist Republics, as Military attache in August, 1950. The accused relayed all military information received to his superiors by classified messages. While he was attending a top secret conference of military attaches and intelligence officials in Frankfurt, Germany, during June and July, 1951, persons unknown photostated the accused's diary in which he customarily recorded important events of his life for a long period of years. The compromise of the diary was not discovered until January, 1952, when

portions thereof appeared in a Communist publication entitled "Auf den Kriegspfad"—"On the Path to War" authored by a former British officer who had joined the Communist cause. The accused was immediately recalled to the United States and assigned to the Second Army, under the command of the convening authority. An investigation immediately followed, revealing entries in the accused's diary which form the basis of the charges in this case.

II

The appellant first contends that the convening authority was inferior in rank and command to the accusers, and therefore lacked the power to appoint a general court-martial in this instance. This issue was initially raised before the trial court by a motion to dismiss all charges and specifications for lack of jurisdiction, and is premised on the contention that the Secretary of the Army and the Army Chief of Staff are the accusers.

In support of this contention, the defense introduced the following evidence, uncontroverted by the prosecution: When the Department of the Army became aware of the publication of General Grow's diary, General Taylor, Deputy Chief of Staff, acting for the Chief of Staff, ordered the accused to return to the United States, and directed the Inspector General to investigate the incident to determine whether the disclosure of any information contained in the diary was detrimental to the interests of the United States. During the course of this investigation, the accused voluntarily surrendered his diary. When the investigation was completed in February, 1952, the file was submitted to Colonel Bard, Chief of the Military Justice Division in the Office of The Judge Advocate General for the preparation of appropriate charges. Thereafter, the General Staff observed the reaction to the disclosure of the diary entries in the United States and abroad. The Secretary of the Army was concerned lest the publicity attendant upon a trial of the accused become

additional propaganda material for the Communists, and consulted with various officials of the Government upon the question. During April, 1952, five specifications were prepared and were considered in a conference attended by the Deputy Chief of Staff, The Judge Advocate General, and members of his staff, members of the General Staff, the Chief of Information, the Chief of the Legislative and Liaison Division, the Inspector General, and the representatives of the Division of Psychological Warfare. It was determined that one of the specifications should be deleted, and the remaining four specifications delivered to the Commanding General, Second Army, for appropriate action. These recommendations were approved by the Chief of Staff, who submitted them to the Secretary of the Army; the latter, having determined that no necessity for interrupting the normal routine of military justice existed, also approved the recommendation. Only the specifications agreed upon were submitted to the Secretary of the Army and the Chief of Staff. Neither examined any of the evidence against the accused. When the accused's former superior on the General Staff, General Bolling, G–2, and his assistant, declined to sign the charges, protesting that neither had sufficient knowledge of the case, Colonel Bard did so on April 26, 1952. On the following day, the complete file was delivered to the Chief of Staff of the Second Army and the Army Staff Judge Advocate. No directions were given to the Commanding General, Second Army, to refer the charges to trial. When they were received, they were examined by the Staff Judge Advocate who recommended that the charges be referred to an investigating officer in compliance with Article 32 of the Code, 50 USC § 602. The convening authority concluded from his examination that trial was warranted. Thereupon, the necessary pre-trial investigation was directed. During the course of this investigation it was discovered that the diary also contained a reference to top secret messages relating to a Chinese offensive. Consequently, the additional charge was preferred and signed by an assistant Staff Judge Advocate.

Both the law officer and the board of review found that the only interest of the Secretary of the Army and the Chief of Staff was official, and resolved this issue adversely to the accused. The accused now contends that by directing the preparation of charges, both the Secretary of the Army and the Chief of Staff became the accusers, and Colonel Bard was only a nominal accuser. As an indication that the convening authority was under compulsion or moral suasion, the defense relies upon the relief of Lieutenant General Hoge as a member of the court at the request of the Department of the Army. When trial began on July 23, 1952, Lieutenant General Hoge, as ranking officer present, served as president. He presided at the trial throughout the day while evidence was presented and arguments were made in support of defense motions. When the court reconvened on July 24, the trial counsel announced that Lieutenant General Hoge had been relieved by the convening authority for good cause. The defense objected to this action and requested an inquiry. This objection was withdrawn, however, when trial counsel represented that the Department of the Army had requested his relief, and the convening authority, in the exercise of his discretion and because of the military exigency of the situation, relieved Lieutenant General Hoge.

As we noted in United States v. Bernard G. Gordon (No. 258), 1 USCMA 255, 2 CMR 161, decided March 19, 1952, a bitter controversy has existed over the alleged command control of courts-martial arising out of the appointment of the members thereof by military commanders. This controversy engaged the attention of Congress at the time the Uniform Code of Military Justice was under consideration. Those who proclaimed the existence of such control proposed that authority to convene courts-martial be divorced entirely from command and vested solely in an independent Judge Advocate General's Corps. This proposal was rejected, and Article 22 of the Code, 50 USC § 586, embodying the former military law on the subject as developed over a period of approximately one hun-

dred years, was adopted. Article 22 of the Code, supra, vests authority to appoint general courts-martial in Army commanders, among several others, and provides further:

"(b) When any such commanding officer is an accuser, the court shall be convened by superior competent authority, and may in any case be convened by such authority when deemed desirable by him."

Article 1(11), 50 USC § 551, defines an "accuser" as follows:

"'Accuser' shall be construed to refer to a person who signs and swears to charges, to any person who directs that charges nominally be signed and sworn by another, and to any other person who has an interest other than an official interest in the prosecution of the accused; . . ."

We have been confronted on two occasions with the necessity of determining on undisputed facts whether a convening authority was the accuser within the meaning of the Congressional prohibition. In United States v. Gordon, supra, the accused had attempted to burglarize the quarters of the convening authority. Although the specification alleging this offense was deleted from the charge sheet when the reference to trial was made, we declared that under the circumstances, the appointing authority was so closely connected with the offense that a reasonable person could conclude that he had a personal interest in the matter. Applying this test in United States v. Jewson (No. 532), 1 USCMA 652, 5 CMR 80, decided August 29, 1952, we declared that a convening authority was not disqualified because he had directed the investigation out of which the charges arose. Under such circumstances, we declared a reasonable person could not conclude that the convening authority's interest in the case was anything but official.

The principle of the latter case is controlling in this instance. It is apparent that the disclosure of military information in the accused's diary, as published in the Communist press, indicated a strong likelihood that security regula-

tions had been violated by the accused. Under such circumstances it was necessary to determine what curative or punitive disciplinary measures should be taken, as in any ordinary case. However, this was not an ordinary case, for the individual involved was a well-known general officer who had occupied a most important and sensitive position. Furthermore, there was a definite risk of furnishing additional adverse propaganda material to the Communists, who have shown themselves skillful at using the thinnest material to their complete advantage. The decision to proceed with, or prohibit, disciplinary measures could be made only at the highest military level. In making the decision to proceed with trial, no reasonable person could conclude that the interest of either the Secretary of the Army or the Chief of Staff was anything but official. The absence of even a suggestion of personal interest such as was present in the Gordon case, supra, impels the conclusion that neither was an accuser. Consequently, no requirement of the Code, the Manual for Courts-Martial, United States, 1951, or of reason, demanded that the charges be forwarded to The President, as the only official superior to the Secretary of the Army and the Chief of Staff. The provisions of paragraph 30h of the Manual, supra, were applicable, and the reference of the charges to the convening authority, then the accused's immediate superior, was appropriate.

We have carefully examined that portion of the record relating to the relief of Lieutenant General Hoge from the court, not solely to determine whether the military superiors of the convening authority exercised an undue influence over the court-martial, but also to determine whether his relief was inconsistent with the Uniform Code. The first essential of a common law jury in criminal causes is that it consist of twelve members, no more nor less. People v. Howard, 211 Cal 322, 295 P 333, 71 ALR 1385, 1387. Provision is made by statute in many states, however, for one or more alternate jurors to be selected at the same time as the other jurors. The alternate hears the testi-

mony together with the closing arguments and instructions to the jury, but does not participate in the deliberations. He serves solely as a substitute for a regular juror in the event of death, illness, or subsequent disqualification and eliminates the necessity of a retrial in the event of the occurrence of such incidents. See Annotation, Substitution of Juror, 70 ALR 188; Abbott Criminal Trial Practice, 4th ed., section 229, page 431. The numerical requirement of general courts-martial, however, is established by Article 16(1) of the Code, supra, 50 USC § 576, as "any number of members not less than five." Article 29(a) of the Code, 50 USC § 593, prohibits the absence or excuse of a court member after the accused has been arraigned, except when such absence or excuse is occasioned by physical disability, challenge, or order of the convening authority for good cause. Provision is also made for the appointment of new members whenever the number is reduced below five. In such event the proceedings up to that point must be read to the court in the presence of the accused and his counsel.

Discussing this provision in the Vanderbilt Law Review, Volume 6, Number 2, page 175, dated February, 1953, Professor Edmund M. Morgan, Chairman of the Committee which drafted the Uniform Code, states:

". . . This article recognizes the military necessity of transferring officers from court-martial duties to other functions in unusual situations. Assuming honest administration, it is a wise provision; but it must be conceded that it carries risk of abuse. If the Code were applicable only in peace time, this article could hardly be justified."

Because the substitution of court members after arraignment is such a departure from the principles applicable to jury trials, and presents such a risk of abuse, we will view with circumspection any relief of a member after arraignment. Records of trial should set forth in detail the basis of the absence or relief of any member and affirmatively establish that such absence or

relief falls within the provisions of the Code.

The ground ascribed by the convening authority in this case was military exigency. This ground is the strongest argument in support of Article 29 of the Code, supra. Since this basis was accepted by the defense at the trial as dispositive of the issue, and no evidence was introduced by either party indicating that the convening authority's action was tainted by any abuse of discretion, we find that the relief of Lieutenant General Hoge was proper. We find no prejudice to the accused, and no exercise of improper influence arising out of the Deputy Chief of Staff's request for Lieutenant General Hoge's relief. This member's appointment was effected with the concurrence of the Chief of Staff, his immediate superior, as provided for in paragraph 4f of the Manual, supra. As his military superiors, both the Chief of Staff and his Deputy, had a more intimate knowledge of the requirements of the member's military duties, and properly called these matters to the convening authority's attention when it was apparent that the numerical requirements of the court were satisfied. As pointed out by the board of review, if any numerical disadvantage resulted to the accused, appropriate relief could have been afforded upon a request for the appointment of an additional member.

### III

The accused next contends the specification of the charge, and the specification of the additional charge fail to allege offenses. Consequently, it is argued, the law officer erred to the prejudice of the accused in denying the defense motion to dismiss these specifications.

Specification 1 of the Charge, alleges that the accused violated paragraphs 1 and 6 of Army Regulations ▓▓ .380–5, by wrongfully recording classified military information in his personal diary without properly classifying it. The specification contains the complete diary entry, and substantially summarizes the report of his committee to a conference

of United States Military Attaches and representatives of the United States intelligence agencies.

The specification of the additional charge alleges that the accused, at Moscow, U.S.S.R., on March 24, 1951, violated paragraphs 1 and 5 of Army Regulations 380–5, by wrongfully recording in his personal diary classified information relating to plans of the Soviet Far Eastern Revolutionary Committee for a large scale offensive in Korea by the Chinese Red Army. The complete diary entry is set out in the specification, but because of the security aspects of its contents, is not reported verbatim in this opinion. Paragraph 1, Army Regulations 380–5, alleged to have been violated, provides:

"Need for protection.—Certain military information is of value to enemies and potential enemies of the United States and therefore requires protection to prevent its receipt by unauthorized persons. These regulations embody Department of the Army policies and procedures for the safeguarding of classified matter including security of communications. Official matter must be examined and, if protection is required, graded in accordance with the degree of protection necessary. Protection of classified matter is achieved by security of—

a. Preparation, reproduction, and dissemination.

b. Handling, possession and storage."

The accused concedes the propriety of assigning the classification of "Secret" and "Top Secret" to these entries in the diary for the purpose of this assignment of error, but asserts that the regulations do not prohibit the keeping of a diary, nor does the requirement that military information be classified relate to an entry which is not intended to be seen by others. Continuing this argument the accused urges that the sole purpose of the regulations is to protect classified information from disclosure to the enemy, and the only purpose or need for grading official matter is to aid in its proper reproduc-

**84**

tion, dissemination, handling, possession, and storage, by friendly persons, who, so warned, will protect it from the enemy.

It is clear that these regulations direct affirmative action to protect official matter falling into the categories of "Top Secret", "Secret", "Confidential", or "Restricted", established by and defined in paragraphs 5, 6, 7, and 8, respectively, of the Regulations. The purpose motivating an individual's preparation, reproduction or dissemination of such material is unimportant. The mandate distinctly requires, first, an examination of the official matter to determine the protection required, and second, the grading of the matter in a classification commensurate with the degree of protection necessary. These directives apply under all circumstances, and are not modified by the method used by the individual involved or by the book in which the information is recorded. Consequently, a failure to classify military information recorded in any manner, according to the degree of protection needed, constitutes an offense under Article 92 of the Code, supra, or, if the failure occurred prior to May 31, 1951, the effective date of the Code, under Article of War 96.

Employing an additional approach to the problem, the accused next asserts that even if the acts alleged are prohibited by the regulations, the violations are purely technical, administrative infractions of such an insubstantial nature as not to amount to offenses at all. It is sufficient answer to this contention to note that any violation of a specific directive involves some degree of technical and administrative malfeasance. Whether that degree is sufficiently serious to warrant trial by court-martial is a question for the determination of the convening authority. In this instance that determination was adverse to the accused. At the trial level, evidence of the insubstantial nature of the failure to obey may be received in mitigation of the offense, but may not serve as a test of the sufficiency of the specification to allege an offense. The test of a specification has been held to be

whether it contains the elements of the offense intended to be charged, sufficiently informs the accused of what he must be prepared to meet, and is sufficiently definite to eliminate the danger of future jeopardy. United States v. Marker (No. 281), 1 USCMA 393, 3 CMR 127, decided May 19, 1952; United States v. Snyder (No. 409), 1 USCMA 423, 4 CMR 15, decided June 5, 1952.

In the instant case, each questioned specification describes the directive violated; the action of the accused relied upon as constituting the offense, is alleged, namely, recording military information without assigning its proper security classification; and finally, the information so recorded is set out verbatim. This particularity of the allegations satisfies the requirements of paragraph 28c of the Manual, supra, and of the test described above. Consequently, the law officer rightly overruled the defense motion to dismiss these specifications.

### IV

In his final assignment of error the accused alleges that the evidence is insufficient to support the findings. As to each specification involved the accused has admitted making the diary entries described. As to Specifications 3 and 4 of the Charge, no contention is made that the accused's manner of safeguarding the diary was consistent with military directives. The sole point at issue, therefore, is whether the proof established that the entries contained security matters which the regulations require to be graded in accordance with the degree of protection necessary.

The category "Secret" must be assigned to information or material, the unauthorized disclosure of which would endanger national security, cause serious injury to the interest or prestige of the nation, or be of great advantage to a foreign nation. Paragraph 6, Army Regulations 380–5. Since the classification of military information ■■■■■■■ requires a knowledge and experience not generally possessed by men of common education and experience, expert testimony on the subject may properly be received in evidence. Paragraph 138e, Manual for Courts-Martial, United States, 1951. Such testimony was presented by the prosecution through witnesses ■■■■■■ whose qualifications were unquestioned. One was the deputy assistant Chief of Staff, Intelligence, with thirty-four years of military service, who has been engaged in intelligence work for sixteen years. The second expert was the former Chief of the Security Division, Office of G–2, Intelligence, under whose direction the present security regulations were formulated. Their combined testimony, together with relevant exhibits, established that the diary entry in question, forming the basis of Specification 1 of the Charge, and set forth above, was "Secret" for it related to a conference, the theme of which was classified "Top Secret", and contained the essentials of the accused's committee report which was classified "Secret" in the report of the conference; moreover, the plans evolved at this conference could not succeed if the Communists knew of them in advance.

The specification of the additional charge pertains to the offensive plans of the Chinese Communists. ■■■■■■ In this connection it was established that an American Military Attache relayed to the Department of the Army a "Top Secret" report received from a named individual that the Soviet Far Eastern Revolutionary Committee planned a large scale offensive in Korea. The Department of the Army sought confirmation of the report from the accused. The accused's reply was also marked "Top Secret". It is apparent that the diary entry, as reported above, summarizes the contents of these messages, omitting only the name of the individual originally supplying the information. The defense produced evidence that various newspapers and magazines also reported the plans of the Communist spring offensive, and further showed that such an offensive was a matter of common knowledge and discussion in the diplomatic colony of Moscow. Hence, it is urged, the classification of "Top Secret"

■■■■■■■■■■■■■■

was merely a formality with no significance, or justification in fact. While this contention has apparent cogency, examination of the diary entry in the light of the regulations completely dissipates its merit. Paragraph 5b(2) requires the classification of "Top Secret" be applied to all intelligence documents, and the information contained therein, which reveal a major intelligence effort on the part of the United States and which would permit an evaluation by unauthorized recipients of the success obtained by, or the capabilities of, our intelligence services. Unquestionably an accurate report of a planned major offensive to be made by the Communists without regard to the danger of precipitating a major war, represents a major intelligence effort, the disclosure of which would afford a means of appraising the success and capabilities of our intelligence services. The sources of the newspaper and magazine articles are not disclosed, nor are they material; but the source of the accused's diary entry is noted. It requires little knowledge of military affairs to conclude from this alone that the disclosure of the source of information advises the Communists where their counterespionage efforts should be concentrated. Furthermore, if such matters as are here disclosed form the basis of common knowledge and discussion in the diplomatic colony of Moscow, the success of those against whom our efforts are aimed should occasion little surprise. Indeed, this type of irresponsible talk eloquently bespeaks the necessity for further and more stringent enforcement of security measures. Most certainly it does not afford the accused a haven of defense in this instance. We conclude, therefore, that the court-martial and the board of review properly found the entries described in Specification 1 of the Charge and in the specification of the additional charge to be "Secret" and "Top Secret" matters, respectively. Consequently, the accused's failure to assign the proper category to the entries completed the proof of the offenses alleged in these specifications.

The essential elements of the offense of dereliction in the performance of duty, alleged in Specifications 3 and 4 of the Charge, are first, that the accused had certain prescribed duties and second, that he was derelict in the performance of those duties. The duty of the accused in these instances was to grade the diary entries according to the degree of protection needed. The proof established that the accused was assigned as Military Attache in Moscow. In this capacity he reported all intelligence information received to the Department of the Army. Each entry described in the specifications was shown to be a summary of information collected or received by him and reported to the Department of the Army in messages marked "Secret". Testimony of expert witnesses established the correctness of this classification in each instance. Whatever factual issue was created by the testimony of the defense witnesses was decided adversely to the accused. In view of the admission of these witnesses that they would not want the information disclosed to the Russians, it cannot be said that the resolution of these factual issues was arbitrary or capricious. Having recorded classified information in his diary, the regulations required him to safeguard it by the adoption of appropriate measures to prevent its receipt by unauthorized persons. Such protection could be accomplished in this instance, it was shown, by storing the diary in a safe or cabinet secured by a double combination lock. Rather than take such precautions, the accused asserted that he treated the diary as a letter from his Congressman or a copy of the Saturday Evening Post. While on an official visit to Frankfurt he customarily left the diary on his desk or on the floor beside his brief case, making no effort to secure it. Paragraph 171c of the Manual, supra, provides:

". . . A person is derelict in the performance of his duties when he willfully or negligently fails to perform them, or when he performs them in a culpably inefficient manner. When the failure is with full knowledge of the duty and an intention not to perform it, the omission is willful.

When the nonperformance is the result of a lack of ordinary care, the omission is negligent. . . ."

The testimony established the basis upon which the duty imposed by the regulations applied to the accused. His own description of the manner in which he left the diary exposed to view by unauthorized persons, conclusively supplied the final element of dereliction of duty, namely, his failure to exercise ordinary care to prevent the disclosure of military information to unauthorized persons. Thus, by recording the information in the first instance he prepared the way for a succession of unfortunate incidents culminating in the publication of excerpts from the diary as a strong Communist propaganda weapon. The prevention of such results was the principal purpose of the regulations which the accused violated. While many of the quotations ascribed to him in "Auf den Kriegspfad" were palpable forgeries, it cannot be denied that the accused's negligent handling of the diary furnished that germ of truth which is the starting point of all propaganda.

We conclude, therefore, that the evidence established the guilt of the accused of each offense of which he was convicted. Consequently, we find no merit in any assignment of error.

The decision of the Board of Review is affirmed.

Judges LATIMER and BROSMAN concur.