**UNITED STATES, Appellee,**

v.

**Michael J. DELLAROSA, Airman Basic,
U.S. Air Force, Appellant.**

No. 62,042.
ACM S27862.

U.S. Court of Military Appeals.

Argued Jan. 11, 1990.
Decided July 27, 1990.

For Appellant: *Lieutenant Colonel Francis T. Lacey,* USAFR (argued); *Colonel Richard D.S. Dixon III* and *Captain Paul M. Dankovich* (on brief); *Colonel Fred W. Kuhn.*

For Appellee: *Captain Morris D. Davis* (argued); *Colonel Joe R. Lamport* and *Captain David G. Nix* (on brief); *Colonel Robert E. Giovagnoni* and *Major Terry M. Petrie.*

*Opinion of the Court*

SULLIVAN, Judge:

In March of 1988 appellant was tried by a military judge sitting alone at a special court-martial at Griffiss Air Force Base,

New York. Contrary to his pleas,[1] he was found guilty of negligent dereliction of duty, willful disobedience of a lawful order, and two failures to go to his appointed place of duty, in violation of Articles 92, 90, and 86, Uniform Code of Military Justice, 10 USC §§ 892, 890, and 886, respectively. He was sentenced by the judge to a bad-conduct discharge, confinement for 3 months, and forfeiture of $200 pay per month for 3 months. The convening authority approved the sentence on June 14, 1988. The Court of Military Review dismissed the disobedience charge and specification and approved a reduced sentence of confinement and forfeitures for 2 months. 27 MJ 860 (AFCMR 1989).

This Court granted review on the following two issues of law:

## I

WHETHER THE MILITARY JUDGE ERRED WHEN HE FOUND APPELLANT GUILTY OF NEGLIGENT DERELICTION OF DUTY BECAUSE THE APPELLANT MADE A CALCULATION ERROR WHICH FINDING AMOUNTED TO A FINDING OF NEGLIGENCE *PER SE* BY THE JUDGE.

## II

WHETHER THE UNDERLYING ORDER WHICH FORMED THE PREDICATE OF CHARGE III, SPECIFICATIONS 1 AND 2, IS LEGAL.

We resolve both questions in favor of the Government. The judge did not find appellant guilty of negligent dereliction of his weather-reporting duty simply on the basis of an erroneous calculation. Moreover, the orders to report for extra duty stemming

from his earlier non-judicial punishment were both legal and enforceable. *See generally* Art. 15, UCMJ, 10 USC § 815.

Appellant was charged with dereliction of duty by reason of his *willful* failure to *accurately* record and report weather conditions.[2] Trial counsel argued that the mathematical and scientific impossibility of appellant's entries on February 22, 1988, showed his guilt of this crime. The military judge found appellant guilty of dereliction of duty by reason of his *negligent* failure to *accurately* record and report weather conditions.[3] The military judge did not explain his reasoning in reaching this finding to "a lesser included offense," and he was not asked to do so by defense counsel.

The prosecution's evidence in this case was based on a completed Air Weather Service Form 10 (Jan.1981) for February 22, 1988, at Fort Drum, New York. It showed the same station pressure reading of "28.775" inches and the same altimeter reading of "949" for 8 consecutive hours on the above date as recorded by appellant. It also showed an up and down sea level pressure reading for these same 8 hours as recorded by appellant. The prosecution further relied on the testimony of appellant's commander, Captain Turcotte, a 10-year weather observer. He testified that he had never seen such weather conditions for 8 straight hours but that he had seen it for 4 consecutive hours. He further stated that all three of the above readings should be in direct correlation and that the last two entries of sea-level pressure were mathematically impossible in view of the temperatures also recorded on that form. Although he acknowledged that weather observers did make mistakes in calculations

---

1. Special Court–Martial Order No. 6 erroneously reflects the plea to Charge I.

2. Appellant was charged with willful dereliction of duty in violation of Article 92. The original specification stated that appellant
   who knew of his duties at Building P 2059, Base Weather Station, Fort Drum, New York, on or about 22 February 1988, was derelict in the performance of those duties in that he willfully failed to accurately record and re-

port weather conditions as it was his duty to do.

3. Airman Basic Dellarosa, this court finds you:
   Of Charge I of the Specification, Charge I: Guilty, except the word "willfully," substituting therefor, the word "negligently."
   Of the excepted word: Not Guilty.
   Of the substituted word: Guilty.
   Of the charge, Charge I: Guilty.

from time to time, Captain Turcotte also said that the station pressure and altimeter setting readings were "serious mistake[s]." Finally, the prosecution introduced evidence of readings from an airport 12 nautical miles away which reflected a different weather trend from that shown by appellant's entries.

Defense counsel argued that appellant should not be found guilty of willful or negligent dereliction of duty. He said, *inter alia:*

Now, could that be considered even negligent dereliction of duty? *Well, first of all the defense would contend that at the very utmost, at the very outside, that might be negligent dereliction of duty.* But we don't even think it is that. And the reasons for that are as follows: First of all, the aneroid isn't normally used. Again, you have heard a lot. All the testimony about the DBASI [digital barometer, altimeter setting indicator] is a much easier machine to use. Airman Dellarosa testified that his training on the aneroid came when he was at tech school back at Chanute and that nobody at Fort Drum ever actually sat down with him after he got to his detachment and went through with him exactly how he was using the aneroid. There was no government testimony to dispute that. The government witnesses could say that he had been trained, but none of the government witnesses actually trained him. So, we contend that Airman Dellarosa's testimony would stand on this point when he says that nobody actually sat down with him and went through with him and made sure that he understood exactly how to follow this procedure.

So we are talking about a procedure that is not commonly used. That he had received his only real training back at tech school. He thought he knew how to do it. But again we are looking at a 19 year old who at the time of this incident had been in weather observation for—well, he really only started as an actual observer in June of '87. So we are talking about a period of less than a year where

he had actually been working as a weather observer.

In other words, he is not a seasoned weather observer. And the defense would contend that it wouldn't be really fair to apply the standards of a seasoned weather observer to somebody like Airman Dellarosa who is quite relatively new to the business.

And that explanation would also account for why he didn't really think that there was anything terribly wrong when there was eight in a row that were the same. Again, he testified that nobody had ever told him that that was an extremely unlikely result or something he ought to be suspicious about. So, the explanations are: first of all, maybe he was right. Second, if he was wrong, the explanation is not that he was deliberately doing this but rather that he wasn't tapping the aneroid needle enough to release it. *And was that negligent dereliction? It might have been ineptitude. But, of course, the court realizes that ineptitude is not the same thing as dereliction of duty and certainly not under the circumstances of this case.*

I would then like to just briefly touch on the sea level pressure. I don't think they are nearly as crucial. But, again, I ask the court to consider that those are the last two—The ones that the government says are incorrect are the last two he took. When he took those pressures, he had been on duty for 11 and 12 hours respectively. Certainly it is conceivable that when you are making that kind of calculation and you have been working for 12 hours or 11 hours, that you might be tired and that you might make a calculation error and that is what the defense's theory is it very possibly happened here. He simply made a calculation error. But, again, that isn't nearly as significant according to Captain Turcotte and the evidence we have had as the other types of pressure. So, in s[um] then, the evidence just doesn't show beyond a reasonable doubt that he was deliberately derelict. *Defense contends*

*it doesn't even show beyond a reasonable doubt that he was negligently derelict.* It may show some ineptitude at most. But, again, considering his views and his level of experience and his training, even that ineptitude is entirely understandable.

(Emphasis added.)

Trial counsel responded to this argument as follows:

TC: Your Honor, I just want to clarify some things. The defense counsel argues that as a result of the machine by him only tapping it one time then maybe the machine was stuck the whole time. But if you will remember Airman Dellarosa's testimony, he said he did it basically every hour, which means he tapped it eight times. So, even if you assume their theory, he tapped it at least eight times during that shift and it should have worked some time. But if you look at the weather and reports during that time period 12 hours away, the weather changed. *If you look at the shift before him, the weather changed. If you look at the shift after him, the weather changed. It is pretty unreasonable that the weather remained the same that whole time.*

MJ: But even given that, trial counsel, tell me something. When we look at the specification of Charge I, is the accused charged with failing to take accurate weather reports or with failing to accurately record and report the readings that he did take?

TC: He is charged with failing to accurately report the ratings that he did take.

MJ: Now, realizing that, how does that stack up with the statement that you just made?

TC: The bottom line is he either—the position of the government is he was there—

MJ: I think you missed the essence of my question. The essence of my question in view of your answer to my question is: Of what relevance are the actual weather conditions on the evening of 22 February? If he is charged with failing to accurately record and report the readings that he actually took, then how relevant is it that the weather conditions were other than those reflected on the readings recorded on Prosecution Exhibit 4?

TC: Because it is relevant to show that this person: one, intentionally put the wrong things down. *It is relevant to show that also the person should have figured out, even if he thought he was reading them right, he should have figured out that the things were wrong.* But either way it goes, this accused here was derelict in his performance of his duty.

MJ: But the government's theory is that assuming the weather conditions were other than those that are recorded here, then that ipso facto proves that the accused in fact knew the actual weather conditions and then willfully put down incorrect figures. Am I following you?

TC: That is correct. He should have known.

MJ: You may proceed.

TC: *He should have known. He should have known what the weather was and he didn't put it down correctly, based upon the evidence as presented and available.* He knew how to work the machine. And even if he did, you still have a person that did not record and report the weather properly.

And as he told you. He knew how to use the machine. He told you that he looked at it and all this stuff. So, the government's position is he is guilty of the offense.

(Emphasis added.)

I

Appellant asserts that the military judge employed an incorrect legal standard in finding him guilty of negligent dereliction of duty under Article 92(3). He contends that the judge found him guilty of this offense simply because he made some mis-

takes in his weather readings and calculations without regard to the reasonableness of these mistakes. He characterizes this incorrect standard as akin to "negligence *per se*," *cf.* W. Keeton, D. Dobbs, R. Keeton, and D. Owen, *Prosser and Keeton on The Law of Torts* § 36, at 229–33 (5th ed.1984). He also claims that the prosecution failed to introduce sufficient evidence of his guilt under the proper standard of negligence required for conviction of this offense. We reject both these arguments.

As a starting point, we note that negligent dereliction of duty is usually associated with nonperformance of a duty. Culpable inefficiency is the language which more appropriately describes faulty performance. *See generally* para. 171*c*, Manual for Courts–Martial, United States, 1951. *See* J. Snedeker, *Military Justice Under the Uniform Code* § 2905e and h(2)(b) at 617, 620 (1953). However, over the years, the negligence terminology has also been used in the faulty-performance cases, and, accordingly, the previous distinction in language need not be considered significant. *See* Snedeker, *supra* at § 2905i and j; *United States v. Kelchner,* 16 USCMA 27, 36 CMR 183 (1966). *See generally* para. 16c(3)(c) and (d), Part IV, Manual for Courts–Martial, United States, 1984.

Turning to the applicable legal standard for conviction of negligent dereliction of duty under Article 92(3), we note this question was decided long ago in *United States v. Kelchner, supra* at 29, 36 CMR at 185. *See also United States v. Ferguson,* 12 CMR 570, 576 (ABR 1953). More recently, this standard was articulated in paragraph 16c(3), 1984 Manual, *supra,* as follows:

(c) *Derelict.* A person is derelict in the performance of duties when that person willfully or negligently fails to perform that person's duties or when that person performs them in a culpably inefficient manner. "Willfully" means intentionally. It refers to the doing of an act knowingly and purposely, specifically intending the natural and probable consequences of the act. *"Negligently"* means an act or omission of a person who is under a duty to use due care which exhibits a lack of that degree of care which a reasonably prudent person would have exercised under the same or similar circumstances. "Culpable inefficiency" is inefficiency for which there is no reasonable or just excuse.

(d) *Ineptitude.* A person is not derelict in the performance of duties if the failure to perform those duties is caused by ineptitude rather than by willfulness, negligence, or culpable inefficiency, and may not be charged under this article, or otherwise punished. For example, a recruit who has tried earnestly during rifle training and throughout record firing is not derelict in the performance of duties if the recruit fails to qualify with the weapon.

(Emphasis added.)

■ There was no dispute at this court-martial concerning the appropriateness of employing the reasonable-man standard in determining negligence for purposes of Article 92(3). Moreover, as noted earlier, trial counsel argued in terms of the reasonableness of appellant's conduct, and defense counsel acknowledged that the judge realized the differences between negligence and mere ineptitude. In this context we are confident that the military judge employed the correct standard in reaching his findings of guilt. *See United States v. Vangelisti,* 30 MJ 234 (CMA 1990); *United States v. Roa,* 12 MJ 210, 211 (CMA 1982); *United States v. Lewis,* 12 MJ 205, 208 n.4 (CMA 1982).

■ The question of sufficiency of the evidence under this standard must also be resolved in the Government's favor. *See generally United States v. Hart,* 25 MJ 143, 144 (CMA 1987), *cert. denied,* 488 U.S. 830, 109 S.Ct. 85, 102 L.Ed.2d 61 (1988); *United States v. Harper,* 22 MJ 157, 161 (CMA 1986). Initially, we note that no direct testimony was presented asserting that appellant's mistakes were unreasonable under the circumstances of this case. *See also United States v. Eckmann,* 656 F.2d 308, 313 (8th Cir.1981). However, no

motion for a finding of not guilty was made at trial by the defense. *See* RCM 917, 1984 Manual, *supra.* Moreover, defense counsel, initially at least, recognized that a prima facie case for guilt of this offense under a negligence standard might have been presented by the prosecution. Finally, Captain Turcotte's testimony concerning the number of mistakes, their egregious nature, and the rarity of the reported conditions in his weather experience was relevant evidence in determining the reasonableness of appellant's conduct. *United States v. Brown*, 26 MJ 148, 150 (CMA 1988); *see* 2 Wigmore, *Evidence* § 461 at 592–608 (Chadbourn rev.1979). This evidence, coupled with evidence of appellant's training and qualification as a weather observer, at least circumstantially provided a basis for the judge's findings of unreasonable conduct. *See generally United States v. Grow*, 3 USCMA 77, 87, 11 CMR 77, 87 (1953). Appellant's purported inexperience and tiredness were circumstances to consider in this regard, but they did not legally preclude a finding of negligence. *Cf.* para. 16c(3)(d), 1984 Manual, *supra.*

## II

Appellant also broadly asserts that his orders to report for extra duty on February 23 and March 1, 1988, were in violation of Article 15, UCMJ, 10 USC § 815, and Air Force Regulation (AFR) 111–9 (ch. 1) (July 19, 1985). Accordingly, he claims his orders to report for extra duty on both of the above dates were illegal and unenforceable at a court-martial. *See generally United States v. Roach*, 29 MJ 33, 36 (CMA 1989); *see United States v. Poole*, 30 MJ 149 (CMA 1990).

In particular, appellant concedes that non-judicial punishment of 14–days' extra duty was imposed upon him on February 12, 1988. He notes, however, that his commander, Captain Turcotte, construed this punishment to permit 8 hours of extra duty to be served for each of these 14 days. Furthermore, he points out that his commander stated this punishment could be broken down into 28 days of 4 hours of extra duty. Finally, he suggests that the commander believed these 4–hour time blocks could be assigned on duty days alone. Appellant contends that his punishment so structured was not "continuous" as required by the Code and Air Force regulations.[4] We must reject this contention, at least to the extent that the questioned orders in this case are concerned.[5]

■ First, we note that appellant did not make these arguments at trial, and his contentions on appeal are unspecific as to the sections of Article 15 and AFR 111–9 which were purportedly violated. *Cf. United States v. Hilton*, 27 MJ 323 (CMA 1989). Second, our review of Article 15 reveals that this punishment can be imposed "for not more than 14 consecutive days." *See* Art. 15(b)(2)(E). The first order to report was allegedly violated on February 23, 1988, which was 11 consecutive days from the date of imposition of the non-judicial punishment. Accordingly, appellant's argument with respect to the illegality of this

---

4. Charge III—Violation of the UCMJ, Article 86 Specification: 1. In that [appellant] did on or about 23 February 1988, without authority, fail to go, at the time prescribed to his appointed place of duty, to wit: Building P 2059, Base Weather Station, Fort Drum, New York. Specification: 2. In that [appellant] did on or about 1 March 1988, without authority, fail to go at the time prescribed to his appointed place of duty, to wit: Building P 2059, Base Weather Station, Fort Drum, New York.

5. Prior to February 1, 1963, there was a 2–hour-per–day limitation imposed by the President on the duration of extra duty which could be imposed under Article 15. *See* para. 131*b*, Manual for Courts–Martial, United States, 1951. Exec.

Order No. 11,081, 28 Fed.Reg 945 (1963), removed the limitation. Absent that limitation, we still have some doubt whether appellant's commander properly construed Article 15 to allow extra duty of 8 hours per day. *See* NAVJAGMAN § 0105a(4); para. 5–3(h)(3), Coast Guard Military Justice Manual.

In any event we have no doubt that his supposition that 28 consecutive days of extra-duty of 4 hours per day was permitted under Article 15(b)(2)(E), UCMJ, 10 USC § 815(b)(2)(E), is incorrect. However, that does not affect the legality of the orders in the present case which were both executed at a 4–hour–per–day duration within the 14–day period.

order is clearly without merit. Third, we recognize that Article 15(e) provides in part that an "appeal shall be promptly forwarded and decided, but the person punished *may in the meantime* be required to undergo the punishment adjudged." (Emphasis added.) This provision, however, does not prohibit a commander from staying the execution of this punishment in cases such as appellant's where there was no appeal. In fact, appropriate regulations permit such a stay which was accomplished with

notice to appellant until February 22, 1988. *See* Table 2 n.1 and 4, AFR 111–9(C1) (July 19, 1985)[6]; *see generally* Art. 15(a) and para. 5(g), Part V, 1984 Manual, *supra* (change 3). Thus, the second order of March 1, 1988, was also well within the 14–consecutive–day rule of Article 15(b).

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge EVERETT and Judge COX concur.

6. NOTES:

1. Unless otherwise stated by the commander, punishments are effective immediately upon notification. Punishments are not stayed upon appeal unless no action upon an appeal is taken within 5 days of the appeal; then, unexecuted restraints or extra duties will be stayed if the member requests.

\* \* \* \* \* \*

4. If necessary, the effective date may be designated as a later date in an action imposing punishment or vacating the suspension. For example, if the member is already undergoing a punishment of restriction or correctional custody, the effective date of the new punishment of restriction or correctional custody may be designated to coincide with the termination of the earlier punishment of restriction or correctional custody.