UNITED STATES, Appellee

v

JOHN A. BOYSEN, Airman First Class,
U. S. Air Force, Appellant

11 USCMA 331, 29 CMR 147

*Major Quincey W. Tucker, Jr.,* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel James L. Kilgore.*

*Major Simpson M. Woolf,* argued the cause for Appellee, United States, With him on the brief was *Colonel John F. Hannigan.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convened at Nouasseur Air Base, Morocco, convicted the accused of two specifications alleging lewd and lascivious acts upon persons under sixteen years of age, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. It imposed a sentence which includes a dishonorable discharge, confinement at hard labor for two and a half years. Intermediate appellate authorities affirmed and the accused brought the case to this Court by petition for grant of review. The question before us is whether sufficient cause was shown for the appointment of another law officer in the course of the trial.

On arraignment on October 16, 1958, the accused stood mute. A plea of not guilty was entered for him. Thereafter, civilian defense counsel moved for a finding of not guilty on the ground that the accused lacked mental capacity to be legally responsible for his actions. A civilian psychiatrist testified by stipulation that he examined the accused and was of the opinion the accused did not know the difference between right and wrong in regard to the offenses charged and that he acted under "the empire of an uncontrollable and unforeseeable pathological impulse." Two military psychiatrists who examined the accused reached a different conclusion. Each said that, in his opinion, the accused had sufficient mental capacity to know right from wrong and was able to adhere to the right in regard to the offenses charged. Each military doctor was subjected to searching cross-examination by civilian defense counsel, and each made certain admissions concerning his examination and evaluation

of the accused, which tended to lessen the weight of his testimony. In any event, at the end of the presentation of evidence on the sanity question, the law officer granted a defense motion for a finding of not guilty on the ground that the Government had not established beyond a reasonable doubt the accused's mental capacity to commit the acts alleged. After appropriate instructions on the issue, the president of the court-martial objected, and the court overruled the law officer and denied the motion.

Immediately after the court-martial's ruling, the prosecution requested a continuance. In an out-of-court hearing on the request, it was determined that the Government's witnesses were not available because the Government and the defense had proposed to introduce their testimony on the merits in other ways. However, the law officer rejected the proposals because the accused did not consent, on the ground that to do so would be inconsistent with his contention that he had insufficient mental capacity to understand the proceedings against him, and to cooperate in his defense, an issue which had been earlier resolved against him. Accordingly, the Government requested postponement for one week, to enable it to obtain the witnesses for direct examination. Individual defense counsel, who had indicated previous to the trial that he could not be present "in the event" trial was continued because he was leaving for the United States the next day and would not return until February 1959, withdrew from the case. Appointed military counsel indicated he had done nothing on the case and he would "have to take some time to prepare"; he remarked

that he would be "more than happy" if the law officer were disposed to grant him more time. On reopening the court, the law officer granted a two-week continuance.

On October 22, trial counsel filed a request for a further continuance until November 13, 1958, to permit the prosecution to have the accused examined and psychiatrically evaluated by another military psychiatrist. Appointed defense counsel objected to the request, but it was granted by the law officer on October 24.

No other formal request for grant of a continuance appears in the record of trial. The court reconvened on December 15, 1958. What transpired in the interim appears partly from a discussion at the opening of the proceedings on December 15 and partly from an out-of-court hearing on December 16.

On October 27, 1958, the accused was sent to Wiesbaden, Germany, for psychiatric evaluation. On November 6 his defense counsel was involved in an automobile accident. About a week later, trial counsel discussed the situation with the law officer, Major Rowe, and the Major said he would "simply note the matter . . . [at] the outset of the next session." The accused was returned to the air base on November 30 and apparently his defense counsel had recovered from the effects of his accident. On December 10, trial and defense counsel engaged in the trial of another case. By special order dated December 4, 1958, Major Rowe was relieved as law officer of the court and Major I. Fisher was appointed in his stead.

Upon the introduction of Major Fisher as the new law officer, it was agreed to defer the question of challenge until he had an opportunity to read the transcript of the proceedings already had. The court was recessed for this purpose. When it reconvened on December 16, defense counsel challenged the validity of proceeding further with the trial, on the ground that there could be no substitution of the law officer under the circumstances of the case. In support of his objection he presented a statement from Major Rowe, former law officer. In pertinent part the document reads as follows:

"This was a complex and heated litigation, primarily concerned with the issues of mental competency to stand trial and insanity as a legal defense to the crimes alleged. The defense introduced evidence by way of a stipulation of testimony tending to show that the accused was incompetent and was legally insane. The prosecution called two psychiatrists to the stand to refute this evidence.

"The nature of their testimony together with the demeanor, bearing, and appearance of these Government witnesses on the stand during both direct and cross-examination was a substantial factor in my ruling sustaining the defense motion for a finding of not guilty based upon insanity at the time of the alleged offense. The printed record does not, of course, reflect all these factors.

"I have made this statement at the request of First Lieutenant Bruce Morgan, counsel for the accused. Because of orders directing my transfer to the United States, I am no longer available to serve as Law Officer of this court-martial and understand that I have been relieved of such duty." Signed, "Cecil F. Rowe, Major, USAF, Judge Advocate, Date: 11 December 1958."

Although defense counsel indicated he did not intend his challenge to the proceedings to be a challenge to the law officer, the latter submitted the question to the court-martial on that basis. He observed that the defense objection was not a challenge to him personally but to "any certified law officer in the United States Air Force except the law officer who originally sat." However, because the Manual for Courts-Martial, United States, 1951, provides for substitution of the law officers "for good cause," he concluded that inquiry could not "go behind" the decision of the convening authority to make the substitution. The question he submitted to the court-martial was this: "Not having been present when testimony on the merits was heard, or other important proceedings were had in this case, will my sit-

ting as law officer involve an appreciable risk of injury to the substantial rights of the accused, which risk will not be avoided by a reading of the record—such a reading having already been accomplished?" The court voted against the challenge as it was presented to them.

No provision of the Uniform Code refers specifically to the absence or excuse of the law officer of a court-martial after a case is in progress. ■ Article 29, Uniform Code of Military Justice, 10 USC § 829, provides for excusal of court members. It is entitled **"Absent and additional members"** and provides in part as follows:

"(a) No member of a general or special court-martial shall be absent or excused after the accused has been arraigned except for physical disability or as a result of a challenge or by order of the convening authority for good cause."

Appellate defense counsel contend the quoted provision does not apply to the law officer. On the other hand, from its contention that good cause existed for the substitution of Major Fisher for Major Rowe, the Government maintains that Article 29 extends to the law officer. The legislative background clearly supports appellate defense counsel's viewpoint.

Testifying before the Subcommittee of the House Committee on Armed Services in regard to the draft bill providing for the Uniform Code, John P. Oliver, representative of the Reserve Officers Association, said Article 29 should provide that the "law member" should not be excused, and no proceedings should be had in his absence. Hearings before the House Committee on Armed Services on H. R. 2498, 81st Congress, 1st Session, page 755. Later Mr. Oliver's testimony came up for consideration. Mr. Felix Larkin, Assistant General Counsel of the Department of Defense, who played an important part in drafting the bill presented by Secretary Forrestal's Committee, said that Mr. Oliver's objection was not "well taken because this Article [29] concerns members of the court—not law members.

**334**

We provide in another section that the trial may not proceed in the absence of a law member, now called law officer, under any circumstances." Hearings, ibid, page 1160. The intent to exclude the law officer from Article 29 is further evidenced by the commentary, on the sessions of a court-martial (Article 39), in the report of the Committee on Armed Services to the House of Representatives. The comments are as follows:

". . . The requirement of AW 8 that no evidence be received in the absence of the law officer is extended in that the law officer must be present at all times except when the members are to vote or deliberate. *The law officer is not a 'member' of the court* and is not to be present during deliberations or voting." [House Report No. 491, 81st Congress, 1st Session, page 21.]

The Manual for Courts-Martial, United States, 1951, paragraph 37, discusses action by the convening authority to effect changes in the personnel of a particular court-martial. In part it reads as follows:

"*a.* **General.**—Subject to the exceptions stated below (37*b*), it is within the discretion of the convening authority to make changes in the composition of courts-martial appointed by him. For instance, he may appoint new members to a court in lieu of, or in addition to, the members of the original court; or he may appoint a new law officer, trial counsel, or defense counsel in lieu of the personnel designated to perform those respective duties by the original appointing order. When practicable, the convening authority should change the composition of courts-martial from time to time to provide the maximum opportunity to eligible personnel to gain experience in the administration of military justice.

"*b.* **Exceptions.**—No member of a general or special court-martial shall be absent or excused after the accused has been arraigned except for physical disability or as a result of a challenge or by order of the convening authority for good cause (Art. 29*a*).

Military exigencies or emergency leave, among others, may constitute good cause for such a relief. The determination of facts which constitute good cause for the excuse from attendance or the relief of a member after arraignment rests within the discretion of the convening authority."

The quoted passage may be read as indicating that the law officer and counsel do not fall within the exception relating to court members. Consequently, under the general rule, the convening authority may "in his discretion" make changes, and such changes may be made without regard to whether they occur before or after arraignment. So construed, substitution of the law officer, at any stage of the proceedings, would be without restriction of any kind. That result would be wholly inconsonant with the procedure in the Federal courts, without any apparent necessity therefor. Cf. Article 36, Uniform Code of Military Justice, 10 USC § 836.

Rule 25 of the Federal Rules of Criminal Procedure provides that, in the Federal criminal courts, a substitute judge may act for a judge who is absent from the district, has died, is sick or suffering from some other disability in regard to "duties to be performed . . . *after* a verdict or finding of guilty." (Emphasis supplied.) The rule does not authorize substitution of a judge after arraignment and before verdict. Whitman, *Federal Criminal Procedure,* 1950 ed., page 185; see also Freeman v United States, 227 Fed 732, 759 (CA2d Cir) (1915) ; Rule 63, Federal Rules of Civil Procedure; Federal Deposit Ins. Corporation v Siraco, 174 F2d 360 (CA2d Cir) (1949). Since this Court has frequently said the law officer "perform[s] in the image of a civilian judge," and that Federal practice applies to court-martial procedures if not incompatible with law or the special requirements of the military establishment, appellate defense counsel contend there can be no substitution of the law officer during the

stage of the proceedings in issue. United States v Keith, 1 USCMA 493, 4 CMR 85; United States v Knudson, 4 USCMA 587, 16 CMR 161; United States v Stringer, 5 USCMA 122, 17 CMR 122.

For the purposes of this case, we need not go as far as appellate defense counsel would have us go. Suffice it to note that, in setting out the general rule, one leading encyclopedia of law indicates that "extraordinary circumstances" may make it "imperative" to substitute judges in the course of a trial. 53 Am Jur, Trial, § 20; see also Wharton's Criminal Law and Procedure, 12th ed, § 1464.[1] The Manual apparently adopts this rule. It provides that the "law officer should not be changed during the progress of a trial *except for a good reason*" ; and if substitution is made, the trial may proceed "after the substance of all proceedings have been made known to him and the recorded testimony of each witness previously examined has been read to him in the presence of the court, the accused, and counsel." Paragraph 39*e*, page 56.

Appropriately, we may consider excuse of a law officer from the same standpoint as excuse of a court member. Under the Manual, each may be substituted for "good cause." Also, the relationship between the two is in effect suggested by Freeman v United States, supra, one of the cases most strongly relied upon by appellate defense counsel. The court there said that the judge and jury "must remain identical from the beginning to the end" of the trial. Statutory authorization to excuse the one tends to support the view that the excuse of the other, for identical reasons, might not violate the requirements of a fair trial.

We have already quoted Article 29 authorizing the convening authority to excuse court members after arraignment for good cause. Neither the Code nor the Manual attempts to define good cause. The latter, however, gives some

[1] It is worth noting that Corpus Juris Secundum indicates that a much broader rule of substitution is applied in some jurisdictions. It says: "Except where it is prohibited by statute, a change of the presiding judge during trial is not a fatal irregularity, unless actual prejudice results to a party by reason thereof." 88 CJS, Trial, § 36, page 95.

informative examples. It says: "Military exigencies or emergency leave, among others, may constitute good cause for such a relief. The determination of facts which constitute good cause for the excuse from attendance or the relief of a member after arraignment rests within the discretion of the convening authority." Paragraph 37*b*.

We have pointed out that the convening authority's discretion is subject to review on appeal. United States v Whitley, 5 USCMA 786, 19 CMR 82; United States v Grow, 3 USCMA 77, 11 CMR 77; see also House Hearings, op. cit., page 1081. Also, we laid down a general guide for such appellate review. In the *Grow* case we said:

"Because the substitution of court members after arraignment is such a departure from the principles applicable to jury trials, and presents such a risk of abuse, we will view with circumspection any relief of a member after arraignment. Records of trial should set forth in detail the basis of the absence or relief of any member and affirmatively establish that such absence or relief falls within the provisions of the Code."

With these general principles in mind we turn to the facts in this case. The Government did not set out the basis for Major Rowe's relief. However, the statement submitted by defense counsel, which was admitted into evidence, gives us some indication of the background. The document is dated December 11, 1958, a week after the issuance of an order excusing Rowe and appointing Major Fisher in his place as law officer. There is no indication whatever why Rowe was directed to return to the United States, nor is there any clear indication whether he was outside the command when the court reconvened. Be that as it may, good cause contemplates some sort of critical situation as distinguished from the usual and ordinary. The word "exigency" imports urgency, necessity, or crisis. Webster's New International Dictionary, 2d ed, page 893. Normal conditions of military life do not provide the emergency or exigency constituting good cause for

**336**

relief from court-martial duty while the trial is in progress. United States v Boshears, 23 CMR 737. We hold, therefore, that the record of trial does not sufficiently show good cause for substitution of the law officer. It was, therefore, error to proceed with a new law officer, over defense counsel's objection.

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside. A rehearing is directed.

Judge FERGUSON concurs.

LATIMER, Judge (dissenting):

I dissent.

It appears to me that in this area it is inappropriate to use a civilian judge as an exact measuring rod for a law officer. In doing so, my brothers pay no heed to the necessary difference between civilian and military law and give little consideration to the customs and necessities of the service and the provisions of the Uniform Code of Military Justice. And in their end result, they arrive at a conclusion which in the long run will not attain the beneficial ends they desire. Granting this accused a rehearing is not momentous, but the principle laid down is important for the reason that all officers, including lawyers, must be transferred from one military community to another and the movement of personnel cuts across the practicability of having a permanent military judge. As I hope to show, the Code is tailored to meet that peculiarity of military courts and, while it may be a compromise made necessary by the exigencies of the services, it is a practical adjustment which Congress has the power to prescribe.

It is possible that a case may give the appearance of evil if the factual background is not fully stated and, to sweep away that contingency, I supplement my brothers' recitation of facts by relating the following particulars and circumstances reflected by this record. The case was tried at Nouasseur Air Base, Morocco, on October 16, 1958, and December 15, 16, and 17, 1958. The cause for the delay from October to December is of some importance to the issue, and I believe the defense must bear the re-

sponsibility for initiating the chain of circumstances which resulted in the time lag.

The accused was charged with having committed lewd and lascivious acts with an eight-year-old boy and an eleven-year-old girl. He was defended by civilian and military counsel, and his defense at trial was insanity. Prior to that time, civilian counsel, to protect the accused, induced trial counsel to stipulate the testimony of the two children. The reason the defense had for adopting that tactic is obvious, for counsel was defending on the basis of insanity and he hoped to avoid the possibility that the court members would be inflamed against the accused if they observed the innocence of the victims. At the time of arraignment, defense counsel made a motion to dismiss the specifications on the grounds that the accused was not mentally responsible for the offenses and that he lacked the mental capacity to cooperate in his own defense. The law officer properly severed the two parts of the motion, and he first proceeded to hear evidence on the mental capacity of accused to aid his counsel at the time of trial. In support of that issue, the defense was allowed to introduce a written stipulation of a French medical expert who had observed the accused for approximately 45 minutes, and the contents of the document supported the expert's conclusion that the accused was insane. The Government produced two medical experts who testified to the contrary. On that particular issue the law officer ruled that the accused was sane at the time of trial, and no objection was taken thereto.

After that question was disposed of, trial counsel offered a stipulation of facts which contained the testimony of the two children who were the victims of the offenses. When the law officer asked the accused if he joined in the stipulation, defense counsel interposed an objection and, in support thereof, intimated that, because he was contending the accused was insane, he would not permit him to consent to the stipulation. The law officer stated he would not accept a stipulation which the accused would not personally recognize. Even though defense counsel wanted the bene-

fit of the stipulation, he reiterated his objection to the accused becoming a party to it and the law officer refused to change his ruling. That left trial counsel in a dilemma, for defense counsel was raising a bar to a procedure which he had aggressively importuned trial counsel to adopt. Obviously, a continuance to obtain the witnesses was in order but, to accommodate civilian defense counsel, the taking of evidence continued on the second interlocutory question, which was that the specifications should be dismissed because the accused was insane at the time of the offense. The medical evidence previously introduced was amplified by further cross-examination and some additional stipulated testimony was received, but for all practical purposes, the posture of the evidence was unchanged although the Government witnesses may have weakened their case some by their later answers. On this preliminary motion, the law officer found the accused mentally irresponsible for the offenses, but an objection was entered by a court member and, after appropriate instructions, the court-martial by a secret vote overruled the law officer.

At this point in the course of the proceedings, the law officer indicated he would grant a continuance to permit the prosecution to procure the attendance of the victims. Thereupon, civilian counsel announced he would have to withdraw from further participation because he was leaving the next day for the United States and would not return for some five months. The law officer announced he would not continue the case for that length of time, and trial counsel, to protect himself and the Government from being charged with responsibility for any delay, made the following statement and received the following reply:

"TC: Mr. Bohana I would like to get one statement for the record due to the fact that pursuant to our pretrial negotiations [sic] the prosecution was prepared and ready to go forward with its evidence today and that the fact that you are going to be absent tomorrow and not present for the prosecution's case on the merits is not the fault of the prosecu-

tion, but is due to insistance [sic] on your part and not due to the lack of due diligence on the part of the prosecution. I would like to have that statement in the record.

"IC: For the benefit of the prosecution. I had assumed that we could work this out with a stipulation but in view of the fact that that could not be done and I had insisted upon it, it was through no fault of the prosecution whatsoever that the stipulation remains as it is at this time; that a stipulation cannot be accepted."

Because individual civilian defense counsel was not going to be available, military counsel who was assisting was left with the burden of carrying on the defense of the accused. The law officer suggested he would entertain a request for a one-week's continuance to permit the new chief counsel to prepare his line of defense. This suggestion was met with a request for some additional time, and it was finally agreed by counsel for both parties and the law officer that a two-weeks' continuance would be granted. Up to that point, I would say without hesitation that the defense must shoulder the responsibility for the trial not having been completed by the original law officer. Thereafter, a combination of circumstances made further continuances desirable and at least one necessary. In the original hearing, defense counsel had insisted that the evidence of the medical experts for the Government was stale and that a further mental examination of the accused should be ordered by the law officer. The law officer would not go all the way with defense counsel. However, he did agree to have the accused re-examined by the doctors who had testified. The defense objected to that action on the basis that such an examination would be useless as their opinions were fixed, and that contemplated procedure was abandoned. Trial counsel thereafter decided a further examination might be helpful, and it was concluded to transport the accused to Weisbaden, Germany, for additional psychiatric examination. In order to have sufficient time for that purpose, on October 22, 1958, trial counsel submitted to the law officer a motion for a continuance. The motion

was opposed by military defense counsel because he contended the issue had been settled by the prior findings and a further examination was unnecessary. A continuance was granted, however, and accused was flown to the hospital. Some short time thereafter defense counsel was injured in an automobile accident. He was evacuated to Weisbaden for treatment, and both he and the accused returned to their home station on November 30, 1958. The taking of the additional testimony at that base started on December 15, 1958, but in the meantime the original law officer had been relieved from his assignment. He was ordered returned to the United States, and a new law officer was appointed. The orders for relieving the old and appointing the new law officer were dated December 4, 1958.

When the court reconvened, military defense counsel objected to the substitution of law officers. Specifically, he renounced any intention of challenging the new law officer for cause as his theory was that the change was illegal and only the original law officer was qualified to act. This objection was overruled, and the defense then made a motion for mistrial. During these various legal maneuvers, defense counsel was asked about certain procedural rights, including his desire for a further continuance or his wish for the recall of witnesses who had previously testified. He stated categorically he did not want any continuance, nor did he desire that the new law officer recall any of the previous witnesses. This latter rejection becomes of some importance when consideration is given to the contention that the law officer should observe the demeanor of all witnesses. Actually only two had testified in person. They were psychiatrists who were witnesses for the Government, and defense counsel was not at all interested in having them reappear before the new law officer. And on this facet of the controversy, the defense psychiatrist merely submitted a statement to the original law officer, but he appeared in person and testified when the case proceeded. In that instance, the second law officer was in the preferred situation.

The net of the foregoing recitation of facts and circumstances is simply this.

It should prevent any reader from giving credence to the assertion that this case has the appearance of evil or to the innuendo that the Government by command control was seeking to obtain a law officer who was less generous with the rights of an accused. Certainly, had the civilian defense counsel not insisted on a departure from the ordinary processes used in trying an accused and then sought to take advantage of a situation he created, the same law officer would have presided over this case from beginning to end. I, therefore, consider the issue before us to involve only the right of a convening authority to change a law officer when he acts in good faith.

I do not object to my brothers' view that a law officer and court member may be governed by the same rule when considering the question of excusing personnel after the trial commences. However, under military law, it is more important to the accused to have the members see and hear all the witnesses than it is to have the same law officer always present.

As a starting point for my legal development on that score, I shall go back to the common law and the meaning of trial by jury. Over the course of the development of common law and at the time the Constitution of this country was adopted, it was believed that a trial by jury meant a tribunal of twelve men presided over by a judge. I use as my authority for that statement the language found in Freeman v United States, 227 Fed 732, 743 (CA 2d Cir) (1915):

"Before going further, it is desirable to consider what 'trial by jury' means. While the Constitution of the United States and the Constitutions of the states secure a trial by jury, they do not define its meaning. Lord Hale in his History of the Common Law (Runnington's Ed. 1792) p. 291, calls attention to the fact that one of the excellencies of trial by jury lies in the fact that 'the judge is always present at the time of the evidence given in it,' and that he is able, 'in matters of fact, to give them great light and assistance, by his weighing the evidence before them and observing where the question and knot of the business lies, and by showing them his opinion, even in matters of fact, which is a great advantage and light to laymen.' In Hale's Pleas of the Crown, vol. 1, p. 33, it is written:

'The law of England hath afforded the best method of trial, that is possible, of this and all other matters of fact, namely, by jury of twelve men all concurring in the same judgment by testimony of witnesses viva voce in the presence of the judge and jury and by the inspection and direction of the judge.'

"In Lamb v Lane, 4 Ohio St 167, 179 (1854), the court 'after a careful examination of the subject' announced that it was clearly of the opinion that the word 'jury,' where it occurs in the state Constitution, 'means a tribunal of twelve men, presided over by a court and hearing the allegations, evidence and arguments of the parties.' And the opinion was expressed that twelve men 'can never be properly regarded as a jury' unless presided over by a court, and that a 'presiding law tribunal is implied, and that the conjunction of the two is the peculiar and valuable feature of the jury trial.' The Supreme Court of the United States has expressed the same idea. In Capitol Traction Co. v Hof, 174 U S 1, 13, 19 Sup Ct 580, 585, 43 L ed 873 (1889), the court said:

' "Trial by jury," in the primary and usual sense of the term at the common law and in the American Constitutions, is not merely a trial by a jury of twelve men before an officer vested with authority to cause them to be summoned and impaneled, to administer oaths to them and to the constable in charge, and to enter judgment and issue execution on their verdict; but it is a trial by jury of twelve men, in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict if in his opinion it is against the law or the

evidence. This proposition has been so generally admitted, and so seldom contested, that there has been little occasion for its distinct assertion.' "

It is of interest to note that when the Constitution and its amendments were ratified, certain protections were guaranteed to civilians, but only one was specifically mentioned as not applying to members of the armed services. The Fifth Amendment to the Constitution stated that the prohibition against proceeding against an accused person without presentment or indictment by a grand jury was not applicable to cases arising in the land or naval forces. While the Sixth Amendment is silent with regard to the rights of persons in the service, as to the other guarantees found in that amendment, in Ex Parte Milligan, 4 Wall 2 (U.S. 1866), the United States Supreme Court held that the exception stated in the Fifth Amendment applied to the guarantee of a trial by public jury. That Court, in the course of its opinion, stated:

"Another guarantee of freedom was broken when Milligan was denied a trial by jury. The great minds of the country have differed on the correct interpretation to be given to various provisions of the Federal Constitution; and judicial decision has been often invoked to settle their true meaning; but until recently no one ever doubted that the right of trial by jury was fortified in the organic law against the power of attack. It is now assailed; but if ideas can be expressed in words, and language has any meaning, this right—one of the most valuable in a free country—is preserved to every one accused of crime who is not attached to the Army or Navy or Militia in actual service. The sixth amendment affirms that 'in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury,' language broad enough to embrace all persons and cases; but the fifth, recognizing the necessity of an indictment, or presentment, before anyone can be held to answer for high crimes, 'excepts cases arising in the land or naval forces, or in the militia, when in actual service, in time of war or public danger;' and the framers of the Constitution, doubtless, meant to limit the right to trial by jury, in the Sixth Amendment, to those persons who were subject to indictment or presentment in the Fifth.

"The discipline necessary to the efficiency of the army and navy, required other and swifter modes of trial than are furnished by the common law courts; and, in pursuance of of the power conferred by the Constitution, Congress has declared the kinds of trial and the manner in which they shall be conducted, for offenses committed while the party is in the military or naval service. Every one connected with these branches of public service is amenable to the jurisdiction which Congress has created for their government, and, while thus serving, surrenders his right to be tried by the civil courts."

That case is significant in our present setting, and it is authority for the proposition that Congress may provide a forum for the trial of cases in the military which need not meet all of the criteria prescribed for courts which are manned by a judge and jury.

If we follow the development of military courts over the years, they have remained so different from civilian courts that any attempt to force them both into a common pattern is folly. Originally, there was no functionary identified as a judge, and the court members—not lawyers or judges—passed on all questions raised. Colonel Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 172, has this to say on that score:

"We have seen that the law gives to each member, the president included, an equal voice, and it is to be added that all questions and issues, which are required to be passed upon by the court in the course of the proceedings, are decided by a majority vote. This general rule applies to the questions which arise upon the finding and in the adjudging of the sentence equally as to the questions and issues raised by challenges, special pleas, objections to testimony, appli-

340

cations for continuance, motions and other interlocutory proceedings; and to questions raised by or among the members themselves equally as to those raised on the part of the accused or judge advocate. The only exception to the rule is that prescribed by Art. 96—that a two-thirds vote shall be required to adjudge a capital sentence. But the finding of guilty which must precede such a sentence may be arrived at by a majority as in all other cases."

Skipping over the intervening years, it can be said generally that there was no division in military courts such as a judge and jury until the Uniform Code of Military Justice. In 1920, Congress enacted a law whereunder the convening authority detailed one of the members of a general court-martial as a law member, but the appointment of a lawyer was not mandatory. That member was clothed with some of the powers of a civilian judge, but he, too, remained a member of the court-martial, participated in the secret deliberations, voted on the findings and sentence, and was subject to being overruled by the court-martial except in rulings involving the admissibility of evidence. Both legally and factually he was a member of the court-martial and the provisions controlling the appointment, excuse, and relief of those individuals applied with equal force to him. See Articles of War 8 and 31, Act of June 4, 1920, 41 Stat 788 and 793. In 1948, when Congress passed the Elston Bill, it required the law member to have certain professional qualifications, expanded his powers, and gave him some similarity to a civilian judge, but he was still considered a member of the court and subject to the law which governed them. See Articles of War 8 and 31, as amended by the Act of June 24, 1948, 62 Stat 628, 629, 631, and 632.

It was in that background that Congress considered and enacted the Uniform Code of Military Justice, and, much as I, too, would like to place a law officer on the identical plane as a Federal judge, I cannot do so with the law in its present state. It is generally well known and understood that the powers of a Federal judge in the civilian community are divided in the military, and they cannot be consolidated except by Congress. They are allocated by military law to the court-martial, the convening authority, and the law officer. Apropos of our problem here, the court-martial members have the last voice on the insanity of the accused—whether considered as an interlocutory issue or on the merits—and on a motion for a finding of not guilty. They can overrule the law officer in those areas, and significantly they further control him by determining any challenge made against him. But most important of all, they must decide the real issue in the case; namely, the guilt or innocence of the accused, and they have the sole responsibility of assessing the punishment to be imposed. It should be apparent from the foregoing that the members of a military court, even more so than jurors in civilian cases, ought to hear every bit of testimony. And, although in a civilian court a substitution of one juror for another would invalidate the trial, under the Code, substituting one member of a military court for another does not. See Article 29, Uniform Code of Military Justice, 10 USC § 829.

The theory underlying the earlier civilian cases which held that an accused was entitled to be tried by the same judge and jury finds its root in the principle that a judge hears the evidence; that upon final summation, he has, within certain limits, the power to comment upon the evidence and give his reasons for concluding it is trustworthy or untrustworthy; that he has the absolute right to direct a verdict; that he has the duty to affix the punishment after a verdict of guilty; and that he is clothed with the power to grant a new trial if he believes the evidence does not justify the findings. With all of those duties and responsibilities resting on his shoulders, there was a compelling reason for requiring him to see and hear all witnesses. However, under the Articles of War and the present Code, none of those powers ever have been or now are vested in a law officer. True it is that we have held he may comment on the evidence, but that is a prerogative which is seldom used in military courts. In practice, it

is all to the good that the law officer use that power sparingly, for usually the comments do not benefit the accused. Moreover, the court members must themselves determine wherein lies the truth, and it is well that they do so uninfluenced by the law officer. But, by all means, that privilege alone is not sufficient to equate a law officer to a Federal judge in regard to their respective powers to supervise, guide, and control the outcome of cases being tried by them.

While I have considered the civilian rule to require the same judge during all of the proceedings at the trial level, the modern principle is not that strict. A judge different from the one conducting the hearing may decide preliminary issues and, under Rule 25 of the Federal Rules of Criminal Procedure, a substitute judge may impose sentence, grant a new trial, and perform all post-trial essentials. That rule seems to undercut the strict principle that one judge must serve from the beginning of trial until appellate processes commence.

That brings me to the military law on the relief and substitution of members and the law officer. Article 29 of the Code, supra, provides as follows:

"(a) No member of a general or special court-martial may be absent or excused after the accused has been arraigned except for physical disability or as a result of a challenge or by order of the convening authority for good cause.

"(b) Whenever a general court-martial is reduced below five members, the trial may not proceed unless the convening authority details new members sufficient in number to provide not less than five members. When the new members have been sworn, the trial may proceed after the recorded testimony of each witness previously examined has been read to the court in the presence of the law officer, the accused, and counsel."

And those provisions are not new to the law, for as may be seen from the following quotation from Colonel Winthrop's treatise, the relevant portions of this Article are merely a restatement of the law as it has existed over the years:

"A General court, though reduced below five, is not necessarily to be dissolved, nor can it assume to dissolve itself or declare itself dissolved. Such dissolving is a function of the convening commander, who is also empowered, in his discretion, to continue the court by adding a member, or the requisite number of members to bring it up to five, and when thus renewed, its power as a court restored, and it may legally proceed with the trial. The adding, however, of new members to courts-martial, *after a trial has been entered upon,* has been of rare occurrence in our practice. Such action is not indeed illegal; the added member, provided the evidence taken, or material proceedings had, prior to his appearance, be first read to him from the record, and he be duly sworn, (after the accused has been afforded an opportunity to challenge him,) may legally act upon the court during the remainder of the trial and take part in the judgment; and the sentence, if any, imposed by the court will be entirely legal and operative. But this action must be in general of doubtful policy, and is not to be resorted to unless the demands of justice and interests of the service clearly require it. Where, for example, by the death, disability, enforced absence, &c., of a member or members, a court is reduced below five, in the midst of an important trial, so that, if not renewed, its previous proceedings, however extended, will go for nothing, and the trial will have to be recommenced by a new court, to the delay of justice, inconvenience of the service, detriment of discipline, and perhaps greatly increased public expense,—in such a case the authorized commander will be fully justified in continuing the courts by the detail of the requisite number of members." [Winthrop, supra, page 78.]

It is true that the Code does not specifically mention the substitution of law officers, but with the radical change of character from law member to law officer, it is not surprising that Congress and the framers of the Code did not clarify every area rendered doubtful by

the change. However, the Manual for Courts-Martial, United States, 1951, fills in the interstice which concerns us for in paragraph 39e it restates part of Article 29 and makes it applicable to the law officer. This is what it provides:

"The law officer should not be changed during the progress of a trial except for a good reason. If a new law officer is appointed by the court in the course of a trial and is sworn (opportunity to challenge him for cause having been given), the trial may proceed after the substance of all proceedings have been made known to him and the recorded testimony of each witness previously examined has been read to him in the presence of the court, the accused, and counsel. However, see 80b for the procedure to be followed when a new law officer is present at revision proceedings."

I believe Congress answered the basic problem on changing personnel, and I see no reason to question that provision of the Manual. And parenthetically, in that connection, I invite attention to United States v Wilson, 7 USCMA 656, 23 CMR 120. There the error required that the law officer be excused from further participation in the case, and a unanimous Court made specific reference to paragraph 39e and held that the general court-martial, being "without a proper law officer . . . ceased to be a court-martial for any purpose except to take the steps necessary to have itself reconstituted." 7 USCMA at page 660. While the majority of the Court in the case at bar tacitly approve that provision of the Manual, they do not give the same credence to paragraph 37b, which provides that "The determination of facts which constitute good cause for the excuse from attendance or the relief of a member after arraignment rests within the discretion of the convening authority."

I make no contention that we cannot review the action of a convening authority, even in a discretionary area, but I dispute two propositions either asserted or inferred by my associates. First, that the Government must establish that the relief of this law officer was not an abuse of discretion. Second, that good cause contemplates some sort of a critical situation as distinguished from the ordinary necessities of the service.

In the early case of United States v Evans, 1 USCMA 541, 4 CMR 133, my brothers put their imprimatur on this statement of the law:

". . . The burden rests on him who seeks severance to show the risk of prejudice to his defense through joint trial. As a privilege, too, it is a matter resting largely within the discretion of the trial judge—the law member or law officer under court-martial procedure. One asserting error in the exercise of that discretion must assume the burden of showing, not merely that another course might have been preferable, but that in adopting the course taken there was a clear abuse of discretion. This means that he must convince the reviewing tribunal that the denial of a separate trial was, under all of the circumstances, manifestly improper in that it subjected him to substantial prejudice in the conduct of his individual defense. No such showing was or is now made here. Defense counsel's efforts, as indicated, fell far short of a showing of possible prejudice to the accused through joint trial."

Since that time, we have reaffirmed that principle, and I see no reason not to apply it to the case at bar. However, should there be some doubt about the present state of military law, I call attention to the civilian Federal concept. As I understand the cases, they hold with unanimity that where a ruling by a judge is in an area involving judicial discretion, his holding is not subject to review unless the party asserting error shows to the satisfaction of the appellate court that there was an abuse.

Looking at this record within its four corners, it not only falls short of showing that the convening authority abused his discretion, it contains no evidence at all to support that conclusion. The defense never raised that issue for the reason that counsel for accused contended the order was void and thus the reason for its issuance was irrelevant. However, the defense did go far enough to show that the first law officer had been ordered to return to the United States

and would be unavailable to continue with the hearing when the court reconvened. A letter executed on December 11, 1958, by the relieved law officer and offered in evidence by the defense included this statement:

"I have made this statement at the request of First Lieutenant Bruce Morgan, counsel for the accused. Because of orders directing my transfer to the United States, I am no longer available to serve as Law Officer of this court-martial and understand that I have been relieved of such duty."

If the record was silent as to the grounds for relief of the original law officer, we ought to assume his transfer was for good reason, but here, in addition to the above evidence, we have something to support a finding of good cause. Article 6(a) of the Code, 10 USC § 806, provides as follows:

"The assignment for duty of all judge advocates of the Army and Air Force and law specialists of the Navy and Coast Guard shall be made upon the recommendation of the Judge Advocate General of the armed force of which they are members. The Judge Advocate General or senior members of his staff shall make frequent inspections in the field in supervision of the administration of military justice."

I am certain this Court can judicially notice that members of the armed forces are stationed overseas in many countries and that each service has regulations governing the length of the tour of duty in foreign countries. Relief of a member overseas requires a replacement, moves must be planned before they actually take place, and each Judge Advocate General must operate prospectively to keep his branch of the service operational. It is virtually impossible to deal with officers on an individualized basis, and undoubtedly the return of this law officer to the United States was ordered by a headquarters which was unaware of the pendency of this criminal prosecution. It is reasonable to operate on a master plan and a convening authority should not be considered arbitrary or unreasonable unless there is

some showing he was put on notice that he was interfering with the proper functioning of a court-martial. Certainly, the accused made no showing to that effect and, while defense counsel was aware of the relief at least four days prior to the reconvening of the Court, he did not notify the convening authority he was opposing any substitution. I, therefore, assert the record is barren of any evidence which remotely supports a finding that the convening authority abused his discretion.

Contrary to the expressed views of my associates, in ascertaining the meaning of the phrase good cause, I would not go beyond the usually accepted definition. I believe all that phrase means is that the convening authority must have some justifiable reason for the action he took. Merely because the Manual gives two illustrations involving differing degrees of urgency does not exclude other reasons which may be less critical. The very next sentence goes on to say that the determination of good cause rests in the sound discretion of the convening authority, and I have already discussed the principles governing the abuse of discretion. Of course, I do not contend that law officers are a special brand of individuals who can be relieved by a convening authority upon most any pretext. On the contrary, I assert that it is much the preferred practice to have the case commence and end under the same guiding officer. Orderly trial proceedings alone would argue in favor of that principle, but there are other functions to be performed by the military service, and they too must be conducted in an orderly manner. There must be some compromise between the mission of the armed service to protect this country and the mechanics of trial to protect an accused, and we should keep them in balance. Their relative importance may change with the times and with conditions, but we are not here concerned with a substitution which in any way prejudiced an accused and, therefore, even though I am willing to assume that under present conditions his rights are paramount, I do not join my brothers in their disposition.

To establish my contention that the accused was not prejudiced, I present

the following facts. In this connection, I am going to overlook the fact that the defense is chargeable with creating the situation which caused the substitution. When the first law officer was in charge of the court, the defense proceeded to litigate two interlocutory questions only. Two live witnesses appeared and testified while one presented his evidence through a stipulation. The interlocutory questions were decided adversely to the accused and, when the court reconvened, it proceeded to determine the guilt or innocence of the accused which was entirely severable from the preliminary questions. Under the guidance of the new law officer—and parenthetically I note that he followed the Manual provisions with respect to reading the testimony of the witnesses who had testified—all witnesses appeared and testified except the two prosecution doctors. However, the substituted law officer offered to recall these witnesses, but defense counsel objected. It is therefore shown that regardless of the switch in the military judges, the court-martial members heard every witness and were able to evaluate their credibility. The new law officer heard all of the evidence on the merits and half of the live evidence on insanity. He had familiarized himself with the testimony of the two prosecution psychiatrists, and had the accused desired him to observe their demeanor, defense counsel had an excellent opportunity to accomplish that end by accepting the offer to have them recalled. But pretermitting counsel's calculated risk, and speculating that the law officer was reluctant to comment on their testimony because he did not observe their demeanor, in this setting that made no difference. Here the court-martial members, who had the final say on that subject, had already made their evaluation and any comments by the law officer would have been after the fact. Moreover, the evidence of the commission of the offenses was overwhelming and the only motion made by the defense after the substitution sought to have the court-martial find the accused insane at the time the court reconvened. According to counsel, this motion was different than the first and was predicated largely upon accused's in-court behavior, all of which had been witnessed by the law officer. Finally, defense counsel claimed he was not contending unfairness on the part of the relieving officer or that he was personally and professionally unqualified. Not one of his rulings has been assigned as error, the defense was entirely satisfied with his instructions, and the record shows he ruled with fairness and impartiality. Such being the case, I ask where is the showing of harm? That question is unanswered by the defense and by my associates simply because there is no prejudice.

For the foregoing reasons, I would affirm the decision of the board of review.