UNITED STATES, Appellee

v

RICHARD H. METCALF, Aviation Machinist's Mate R Third Class, U. S. Navy, Appellant

16 USCMA 153, 36 CMR 309

No. 19,008

March 25, 1966

*Commander Walter F. Brown*, USN, argued the cause for Appellant, Accused.

*Major Paul F. Henderson, Jr.*, USMC, argued the cause for Appellee, United States.

## Opinion of the Court

FERGUSON, Judge:

Tried by special court-martial, the accused was found guilty of riot, in violation of Uniform Code of Military Justice, Article 116, 10 USC § 916, and assault consummated by a battery, in violation of Code, supra, Article 128, 10 USC § 928. He was sentenced to bad-conduct discharge, confinement at hard labor for six months, forfeiture of $75.00 per month for six months, and reduction. The convening authority approved the sentence. The supervisory authority reduced the period of confinement and forfeitures to four months, probationally suspended the bad-conduct discharge, and, as thus reduced and suspended, approved the penalty. The board of review affirmed, and we granted accused's pe-

tition for review, specifying the following assignments of error:

"1. Whether the substitution by the Convening Authority of Commander Lavelle for Lieutenant Commander Way during the course of trial, without explanation in the record, was legal.

"2. Whether the instructions (R. 133) on the allegations of Charge I were sufficient.

"3. Whether the evidence is sufficient to establish the offense of riot as a matter of law."

I

The first question before us involves the elimination by the convening authority of the president of the court

**155**

from its membership after arraignment. The record discloses only the following concerning this matter:

"TC: The prosecution calls Lieutenant Higby and it's [sic] first witness.

"PRES [Lieutenant Commander Way]: The court will recess for five minutes.

"The court recessed at 0816 hours, 7 May 1965.

"The court opened at 0830 hours, 7 May 1965.

"PRES [Commander Lavelle]: The court will come to order. The appointing order has been modified, Miss Way has been replaced by Commander Lavelle.

"TC: All parties to the trial who were present together with a new member are again present in court."

A letter attached to the record of trial by the convening authority, enclosing an affidavit from Miss Way, indicates she approached him during the recess and was excused from further participation in the case on the basis of "prior knowledge of the facts of the case."

Code, supra, Article 29, 10 USC § 829, provides that no member of a general or special court-martial "may be absent or excused after the accused has been arraigned except for physical disability or as a result of a challenge *or by order of the convening authority for good cause.*" (Emphasis supplied.)

In United States v Grow, 3 USCMA 77, 11 CMR 77, a unanimous Court early declared, at page 83:

"Because the substitution of court members after arraignment is such a departure from the principles applicable to jury trials, and presents such a risk of abuse, we will view with circumspection any relief of a member after arraignment. *Records of trial should set forth in detail the basis of the absence or relief of any member and affirmatively establish that such absence or relief falls with-*

*in the provisions of the Code."* [Emphasis supplied.]

In so writing for the Court, Chief Judge Quinn adverted to the fact that Code, supra, Article 29, was founded on military necessity, in that the convening authority—particularly in time of war—might find it needful to relieve a court member following arraignment in order that the armed services' primary mission might be fulfilled. He referred to the language of one of the Code's principal architects concerning the Article in question:

". . . This article recognizes *the military necessity of transferring officers from court-martial duties to other functions in unusual situations.* Assuming honest administration, it is a wise provision; but it must be conceded that it carries risk of abuse. If the Code were applicable only in peace time, this article could hardly be justified." [Emphasis supplied.] [Morgan, "The Background of The Uniform Code of Military Justice," 6 Vanderbilt Law Review 169, 175 (1953).]

It is apparent, therefore, that, in United States v Grow, supra, we construed the provisions of Code, supra, Article 29, to permit relief of a member by the convening authority only under limited circumstances, *i.e.,* on the ground of military necessity or exigency, when the officer appointing the court determines, after balancing the interests involved, that the member's services are elsewhere urgently required. We adhered to that position regarding Code, supra, Article 29, in United States v Boysen, 11 USCMA 331, 29 CMR 147, wherein we repeated our injunction that records detail the reasons for such action by the convening authority and refused to equate an ordinary transfer to good cause under the statute. We there noted, at page 336:

". . . Be that as it may, good cause contemplates some sort of critical situation as distinguished from the usual and ordinary. The word 'exigency' imports urgency, necessity, or crisis. Webster's New

International Dictionary, 2d ed, page 893. Normal conditions of military life do not provide the emergency or exigency constituting good cause for relief from court-martial duty while the trial is in progress. United States v Boshears, 23 CMR 737."

Finally, in United States v Greenwell, 12 USCMA 560, 31 CMR 146, where a court member's absence after arraignment was unexplained in the record, we reiterated the language quoted above from United States v Grow, supra, referred to the *Boysen* case, supra, and held they unqualifiedly placed "the duty upon the United States to demonstrate in the record the reasons for a member's absence after arraignment and to establish that such 'affirmatively . . . falls within the provisions of the Code.'" *Greenwell,* supra, at page 562.

The teaching of these cases is plain. The record of trial is required affirmatively to show the reasons for the relief of a court member by the convening authority following arraignment. That duty on the Government's part is not met by the inclusion on appeal of an *ex parte* statement or affidavit purporting to establish such course, *post hoc.* United States v Grow, United States v Boysen, both supra. Moreover, as we said in *Boysen,* supra, good cause for the intervention of the convening authority is not shown by the demonstration of ordinary grounds, but requires a showing of the unusual or extraordinary in order to justify the relief of a member. Finally, we think it clearly apparent that Code, supra, Article 29, was intended to permit the convening authority to intervene in the trial and remove a member 'only for causes external thereto rather than as a part of the challenging process. Morgan, supra, at page 175; United States v Grow, supra; Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, pages 1081, 1158; House Report No. 491, 81st Congress, 1st Session, page 19.

Thus, we have pointed out that, once trial proceedings have commenced, matters incident thereto are normally to be settled by the court itself, without reference of the matter to the convening authority. United States v Johnpier, 12 USCMA 90, 30 CMR 90; United States v Knudson, 4 USCMA 587, 16 CMR 161. True, the Code provides, as we have noted, for excusal of court members by the convening authority after arraignment for good cause. Code, supra, Article 29. It, however, likewise provides a challenging process whereby members may be removed for cause. Code, supra, Article 41, 10 USC § 841. Comparison of the two Articles in light of their legislative background and obvious purpose, see Morgan, supra, at page 175, indicates that intervention by the convening authority was to be on the basis of emergency or military causes which required the immediate services of the member elsewhere. Where, however, the member's service on the court was to be curtailed only on the basis of his or her purported disqualification owing to cause arising in the trial itself or incident thereto, the ordinary challenging procedure was to be utilized and the matter settled, as Congress provided, by the court-martial. Cf. United States v Stewart, 2 USCMA 78, 6 CMR 78; United States v Shaffer, 2 USCMA 75, 6 CMR 75. Otherwise, we would be faced with the consequence of having a court-martial's decision on a challenge for cause subjected to being immediately overruled during the trial by the convening authority's intervention and action. Yet, as we have noted previously, he has no such authority until the trial is completed and the record is before him for review. United States v Knudson; United States v Johnpier, both supra. In short, we hold that Code, supra, Article 29, is not designed as a substitute for the ordinary challenging procedure.

Turning then to the record before us, it is apparent that the elimination of Miss Way by the convening authority was erroneous by any measure.

**157**

First, the record contains no showing at all of the reasons which led to her relief after arraignment. United States v Grow; United States v Greenwell, both supra. Taking into consideration the affidavit and the letter of the convening authority, the only basis shown for this extraordinary action is her statement of some prior knowledge of the case. Such in itself is not even a ground for challenge without further exploration of its extent and effect. Cf. United States v Washington, 8 USCMA 588, 25 CMR 92; United States v Deain, 5 USCMA 44, 17 CMR 44. At the most, it justifies nothing more than invocation of the challenging process and, being clearly incident to the trial itself, does not warrant referral to the convening authority and his invocation of Code, supra, Article 29. Thus, regardless of how this matter is viewed, whether from the standpoint of the silent record alone or the attempted justification on appeal, Miss Way's removal from the court was erroneous and prejudically so. United States v Greenwell, supra. We so hold.

## II

The second and third issues presented inquire into the sufficiency of the evidence to establish accused's guilt of riot and the president's instructions on the elements of that offense. As the two matters are necessarily intertwined, we consider them together.

The evidence establishes that the victims, a group of enlisted men and women, were strolling quietly along the way from the Enlisted Men's Club to the women's barracks. An automobile drove up beside them and stopped. At least four men dressed in civilian clothes emerged and, without provocation, attacked the group with their fists. Two of the women were knocked down. Fortunately, others in the vicinity came running to the victims' aid, and the attackers, seeing their approach, returned to their vehicle and immediately drove off. The car was later stopped at the naval station's gate. Accused and one Hudson were identified as participants in the assault. The president instructed the members on the elements of riot, as follows:

"(1) That the accused was, at the time and place alleged, a member of an assemblage of three or more persons, as alleged;

"(2) That the accused participated in a breach of the peace committed by the assemblage, as alleged; and

"(3) That the breach of peace was committed in furtherance of a common purpose to execute an enterprise, as alleged, by concerted action against all opposition.

"The term 'concerted action' as used in this instruction refers to joint action by the members of an assemblage in pursuance of a common purpose whether or not such common purpose was determined prior to assembly."

Our statute does not define the offense of riot. Code, supra, Article 116, 10 USC § 916, provides only that:

"Any person subject to this chapter who causes or participates in any riot or breach of the peace shall be punished as a court-martial may direct."

In this respect, the Article "deviates from the legislative technique found in other punitive articles of the Uniform Code." Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 267. The offense was "derived from A[rticle of] W[ar] 89." Hearings before House Armed Services Committee on H. R. 2498, supra, page 1231. In that Article, it was connected with waste, spoil, wrongful destruction of property, depredation, and disorderly behavior in "quarters, garrison, camp, and on the march." Article of War 89, Act of June 4, 1920, as amended, 41 Stat 787. It was separated from these provisions of the Code, upon its enactment, as being unconnected therewith. House Hearings, supra, at page 1231.

As the Code does not purport to define the offense of riot, it is to be presumed that Congress thereby intended

the common-law definition of the crime to be applicable and it is to that to which we must turn in setting forth the elements of the offense. Commonwealth v Duitch, 165 Pa Super 187, 67 A2d 821 (1949); 77 CJS, Riot, § 1. Indeed, it would appear such was the interpretation accorded the offense under the antecedent military and naval articles. See Legal and Legislative Basis, supra, page 261, and Manual for Courts-Martial, U. S. Army, 1949, paragraph 176*d*. Moreover, "the modern definition of a riot is in harmony with and follows the common-law definition, and . . . the legal meaning of the word corresponds with the meaning given to it in ordinary usage." Salem Mfg. Co. v First American Fire Ins. Co., 111 F2d 797, 803 (CA 9th Cir) (1940).

In essence, that definition is set out in the Manual for Courts-Martial, United States, 1951, albeit in a misleadingly brief form:

"The term 'riot' denotes a breach of the peace committed by three or more persons in furtherance of a common purpose to execute some enterprise by concerted action against any who may oppose them. As to breach of the peace, see 195*b*.

"Without such a common purpose to be effected by concerted action, the acts of a tumultuous assembly of three or more persons, even though all commit breaches of the peace, do not constitute a riot. . . .

"It is not necessary that the common purpose be determined prior to assembly; it is sufficient if the assemblage actually begins to execute in a tumultuous manner a common purpose formed after it assembled." [Manual, 1951, supra, paragraph 195*a*.]

The foregoing discussion, of course, involves a matter of substantive law and is not binding on this Court in its interpretation of Code, supra, Article 116, United States v Smith, 13 USCMA 105, 32 CMR 105. We prefer the classic statement in the Manual's predecessor, which more precisely de-lineates the common-law understanding of the crime:

"A riot is a tumultuous disturbance of the peace by three or more persons assembled together of their own authority, with the intent mutually to assist one another against anyone who shall oppose them in the execution of some enterprise of a private nature, and who afterwards actually execute the same in a violent or turbulent manner, to the terror of the people, whether the act intended was of itself lawful or unlawful." [Manual, 1949, supra, paragraph 176*d*.]

See also 77 CJS, supra; 46 Am Jur, Riots and Unlawful Assembly, § 2; Burdick, The Law of Crime, §§ 756, et seq (1946); 2 Bishop, A Treatise on Criminal Law, 9th ed, § 1143; 2 Wharton, Criminal Law and Procedure, § 859 (1957); Kenny's Outlines of Criminal Law, 18th ed, § 437.

The difficulty with the definition and discussion in the 1951 Manual's approach, supra, is that it is too simplistic. Taken literally, it means any joint assault or disturbance of the peace by three or more persons constitutes the serious offense of riot, made punishable by a dishonorable discharge, forfeiture of all pay and allowances and confinement at hard labor for ten years, a penalty which seemingly would indicate no such uncomplicated delict was thereby sought to be punished. Manual, 1951, supra, paragraph 127*c*. Yet, the Government urges here that such is precisely the sort of conduct intended to be punished by our "Riot Act" and relies, in part, on Blackstone's comment that "a *riot* is where three or more actually do an unlawful act of violence, either with or without a common cause or quarrel, as if they beat a man." 4 Blackstone, Commentaries (Ewell's 2d ed), page 684. That statement is, in turn, based on an earlier dictum by Lord Chief Justice Coke. Burdick, supra, § 756*b*. As the English courts have since stated, its implications are far too broad:

"This would seem to imply that any assault or malicious injury to

property done by three or more is a riot. . . . If this is Lord Coke's meaning, he stands alone. . . . His definition of riot is an illogical one." [Field v Receiver Metropolitan Police, 2 K. B. 853, 859 (1907).]

Other authorities indicate a similar conclusion. Thus, Bishop declares:

" 'An assault which happens in a private place, out of hearing or seeing of any except the persons concerned, *cannot be said to be to the terror of the people,* and is thus distinguishable from an affray; . . .' *A conflict too sudden to amount to a riot may therefore constitute an affray.*" [Emphasis supplied.] [Bishop, supra, § 1.]

He goes on to state:

"There is not a riot if, three or more persons being innocently assembled, some of them simply fall on another one and beat him. . . . [*T*]*he gist of riot is the terror it creates.*" [Emphasis supplied.] [*Id.,* § 1147.]

In Field v Receiver Metropolitan Police, supra, the court pointed to the need for an unlawful assembly of three or more persons, a common purpose, execution or inception of that purpose, intent mutually to assist each other in the execution of that purpose, and a breach of the peace sufficient to cause alarm to the people or, in the ancient phrase, *in terrorem populi.* See also Burdick, supra, § 757; Bishop, supra, § 1147; Wharton, supra, § 864.

Thus, in Salem Mfg. Co. v First American Fire Ins. Co., supra, the ordinary arsonous destruction of property by three or more individuals was held not to constitute a riot, the court declaring, at page 804: "Such a construction would make practically every crime committed by three or more persons a riot." And in People v Edelson, 169 Misc 386, 7 NYS2d 323 (1938), it was succinctly stated, at page 325:

"The underlying element essential to constitute the statutory crime of riot, and distinguishing it from other crimes involving a breach of peace, is the disturbance of the *public* peace, and that implies the idea of a lawless mob accomplishing or bent on accomplishing some object in such violent and turbulent manner as to create public alarm or consternation or as terrifies or is calculated to terrify people. It is not commonly applied to a brief disturbance even if violence and malicious mischief are involved in the commotion."

In like manner, International Wire Works v Hanover Fire Ins. Co., 230 Wis 72, 283 NW 292 (1939), points out "an element which must be included is the terror or disturbance of persons who are not participating in the violent or tumultuous acts." *Id.,* at page 293; see also Bishop, supra, § 1147.

We agree fully with this concept of the crime of riot, as denounced at common law and by our ■■■■■ statute. The offense originally arose as a protection for the public against the united assaultive force of a combination of three or more persons, in light of the early weakness of the English constabulary. See Kenny, supra, § 429. As the centuries have passed, however, so has the nature of the crime changed. The forces of law and order have long since been strengthened, and individuals no longer fear at every corner terrorization by a simple assault, albeit by multiple offenders. Thus, as was noted in Field v Receiver Metropolitan Police, supra, Lord Coke stands alone in asserting that such behavior by three or more persons constitutes a riot. There must be more, and that essential addition is the terrorization of the public in general— "the idea of a lawless mob accomplishing or bent on accomplishing some object in such violent and turbulent manner as to create public alarm or consternation or as terrifies or is calculated to terrify people." People v Edelson, supra; International Wire Works v Hanover Fire Ins. Co., supra.

Turning to the record before us, it is obvious the evidence does not de-

note a gathering and breach of the peace of that violent and turbulent character. Rather, the encounter was "a brief disturbance even if violence . . . [is] involved." People v Edelson, supra. There is no more here than "A conflict too sudden to amount to a riot," Bishop, supra, §1, wherein a small group simply fell upon another small group and beat them. Criminal conduct this may be, and most reprehensible at that, but the proof simply does not make out the offense with which accused was charged and of which he was convicted. "[T]he gist of riot is the terror it creates," Bishop, supra, § 1147, and that is not shown here.

Moreover, the instructions of the president are likewise deficient. Following the outline of the Manual for Courts-Martial, United States, 1951, supra, he made no mention of the need either to find on the part of each participant a mutual intent to assist each other in their common design or, more importantly, that there need be a terrorization of the public in general. Nor did he refer to the necessity for finding a violent and tumultuous assembly. Yet, all these matters are required, and we commend to the attention of those concerned, the general delineation of the elements of this offense, as found in the 1949 Manual, supra, at page 228:

"(a) That the accused was a member of a violent and tumultuous assembly of three or more persons of their own authority; (b) that accused and at least two other members of the assembly possessed an intent mutually to assist one another against anyone in the execution of an enterprise of a private nature; (c) that the assembly or some of its members committed acts of violence or a tumultuous disturbance of the peace as alleged; and (d) circumstances from which terror and disturbance resulting from such acts of violence may be inferred."

From the foregoing, it is obvious that reversible error is present, as well from the challenging process as on the merits. Moreover, the evidence is insufficient to sustain the findings of guilty of riot, albeit it is equally clear that a joint assault or breach of the peace is made out. Accordingly, a rehearing may be had only on these lesser offenses. We so order.

The decision of the board of review is reversed and the record of trial returned to The Judge Advocate General of the Navy. A rehearing limited to charges of assault or breach of the peace may be ordered.

Chief Judge QUINN and Judge KILDAY concur.